22CA1648 Peo v Mumin 08-14-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1648
Arapahoe County District Court No. 20CR2881
Honorable Elizabeth Weishaupl, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Abdikarim Ali Mumin,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE SCHOCK
Dunn and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 14, 2025

---

Philip J. Weiser, Attorney General, William G. Kozeliski, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Taylor J. Hoy, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Abdikarim Ali Mumin, appeals his conviction for second degree murder.  He argues that the evidence was insufficient to sustain the conviction and that the district court erred by (1) instructing the jury on the initial aggressor and provocation exceptions to self-defense; (2) failing to instruct the jury on the heat of passion mitigator; (3) admitting testimony narrating surveillance video; and (4) admitting a timeline of the victim's text messages and phone calls before and after the murder.  Mumin also contends that the cumulative effect of these errors requires reversal.  We affirm.

## I.    Background

¶ 2    While out with the victim and his girlfriend at a restaurant, Mumin asked the girlfriend to drive him to a gas station, and she agreed.  When they got to the gas station, the two sat in the car arguing.  According to the woman, Mumin was upset that she was dating the victim and not paying Mumin enough attention.

¶ 3    During the argument, Mumin tried to grab the woman's wallet, so she threw it out the window.  She then tried to get out of the car, but Mumin pulled her back in.  Mumin moved to the back seat of the car behind the driver's seat and began yelling at her to drive, threatening to pistol-whip her if she did not.  Eventually, the

1

woman left the car and stood by the store entrance.  She called the victim, told him what had happened, and asked him to pick her up.

¶ 4 Minutes later, a car pulled up, and the victim got out of the passenger side and approached Mumin.  As he did, Mumin drew a gun and pointed it at the victim.  The victim continued to approach Mumin and swung his arm at him.  Mumin stepped back and, within seconds, fired his gun, hitting and killing the victim.  The confrontation and shooting were captured on surveillance video.

¶ 5 Mumin was charged with second degree murder and several other counts.  His primary defenses at trial were either that the gun had discharged accidentally or, alternatively, that he had acted in self-defense.  A jury found Mumin guilty of second degree murder and harassment.  He was sentenced to a controlling sentence of forty years in the custody of the Department of Corrections.

## II.    Sufficiency of the Evidence

¶ 6 We first address Mumin's argument that the evidence was insufficient to sustain his second degree murder conviction.  He contends that the evidence did not establish that he *knowingly* caused the victim's death because there was no evidence that he purposefully pulled the trigger of the gun.  We disagree.

## A. Standard of Review and Applicable Law

¶ 7    In reviewing the sufficiency of the evidence, we review the record de novo to determine whether the evidence was sufficient both in quantity and quality to sustain the conviction. *Johnson v. People*, 2023 CO 7, ¶ 13. We do not "serve as a thirteenth juror and consider whether [we] might have reached a different conclusion." *People v. Harrison*, 2020 CO 57, ¶ 33. Instead, we view the evidence as a whole and in the light most favorable to the prosecution to determine if it is "substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Johnson*, ¶ 13 (citation omitted).

¶ 8    As relevant to this case, a person commits second degree murder if they "knowingly cause[] the death of a person." § 18-3-103(1)(a), C.R.S. 2024. A person acts knowingly when they are "aware that [their] conduct is practically certain to cause the result" — in this case, the death of the victim. § 18-1-501(6), C.R.S. 2024; *see also Mata-Medina v. People*, 71 P.3d 973, 983 (Colo. 2003).

## B. Analysis

¶ 9    Viewing the evidence as a whole and in the light most favorable to the prosecution, we have little trouble concluding that

3

it was sufficient to support a conclusion that Mumin was aware that his conduct was practically certain to cause the victim's death.

¶ 10　　The surveillance video shows Mumin appearing to point a gun at the victim before the brief scuffle that ended with the victim shot in the neck and bleeding on the ground.  The victim's girlfriend testified that she heard a single gunshot before the victim fell, and a forensic pathologist opined that the gun was "close to contact" with the victim when it was fired.  Then, immediately after the shooting, Mumin opened the door and reached inside of the vehicle where the gun was later found.  Moreover, multiple witnesses testified that the victim was unarmed, and no weapons were found near his body.

¶ 11　　In short, the evidence established that the victim was shot in the neck at close range and that Mumin was the only one with a gun.  From that evidence alone, the jury could have concluded that Mumin shot the victim in the neck and was aware that he was practically certain to kill the victim by doing so.  *See People v. Fisher*, 759 P.2d 33, 38 (Colo. 1988) ("[U]se of a deadly weapon is sufficient to allow a jury to infer the culpability element of second degree murder."); *cf. People v. Mingo*, 584 P.2d 632, 634 (Colo. 1978) ("[I]t is obvious that a jury could reasonably conclude that

discharging a gun from a distance of three feet creates such a high probability of death that death was practically certain . . . .").

¶ 12 Stressing that the video does not show him actually pulling the trigger, Mumin characterizes his actions merely as *aiming* the gun at the victim — an act he argues is not practically certain to cause death. But there is no dispute that the gun was fired. When Mumin was the only one seen with the gun, a jury could reasonably infer that he shot it. Mumin's claim that the shooting was accidental was a fact question for the jury. *See Clark v. People*, 232 P.3d 1287, 1293 (Colo. 2010) ("[T]he jury decides difficult questions about the weight it determines to give conflicting evidence."). In assessing the sufficiency of the evidence, we must construe all conflicting inferences in favor of the prosecution. *People v. Trujillo*, 2025 COA 22, ¶ 22; *see also Butler v. People*, 2019 CO 87, ¶ 20.

¶ 13 The same is true of Mumin's assertion that he tried to provide aid to the victim after he was shot. The evidence on this point was conflicting, and different conclusions can be drawn from the video. Again, those conclusions were for the jury to make — both as to whether Mumin provided aid and as to what, if anything, that said about his mental state when he shot the victim. *See People v.*

*Perez*, 2016 CO 12, ¶ 31 ("The jury, not the court, must perform the fact-finding function when conflicting evidence — and conflicting reasonable inferences — are presented."). Our role is limited to determining whether the record supports the jury's verdict. *Id.*

¶ 14    Because the evidence could reasonably support the conclusion that Mumin knowingly caused the victim's death, the evidence was sufficient to sustain his conviction for second degree murder.

### III.    Jury Instructions on Self-Defense Exceptions

¶ 15    Mumin contends that the district court erred by instructing the jury on the provocation and initial aggressor exceptions to self-defense. He preserved his objection as to provocation but not as to initial aggressor. We discern no error as to either.

### A.    Additional Background

¶ 16    Defense counsel objected to the inclusion of the provocation exception in the self-defense instruction on the ground that there was no evidence that Mumin's actions were intended to cause the victim to attack him as a pretext for killing or injuring the victim.

¶ 17    The prosecution responded that its primary theory was that Mumin was the initial aggressor, but if not, he provoked the victim's attack through his conduct toward the victim's girlfriend. The

prosecution argued that a jury could find that this conduct "was intended to cause this later escalation . . . knowing that [the victim] is going to appear, be upset obviously, and then resulting in [Mumin] being allowed to then shoot." When the court asked what specifically Mumin had done to provoke the victim, the prosecution answered that "attacking [the victim's] girlfriend and knowing that she's calling him could be interpreted . . . as provocation."

¶ 18    The district court overruled the objection, reasoning that "both sides can argue their theory of the case using what the jury can see or cannot see on th[e] video and what the testimony provided." It gave a self-defense instruction that included both the provocation and initial aggressor exceptions. Despite the prosecution making clear that its primary theory was that Mumin was the initial aggressor, Mumin did not object to the inclusion of that exception.

B.    Applicable Law and Standard of Review

¶ 19    When a defendant claims self-defense, the prosecution may defeat that defense by proving beyond a reasonable doubt that the defendant (1) was the initial aggressor or (2) provoked the victim to use unlawful force. *People v. Roberts-Bicking*, 2021 COA 12, ¶ 30.

7

¶ 20    The district court may instruct the jury on these exceptions to self-defense if there is "some evidence" to support them. *Galvan v. People*, 2020 CO 82, ¶ 25. This threshold is low and may be satisfied by any credible evidence, even evidence that is highly improbable. *Id.* at ¶ 24; *People v. Mion*, 2023 COA 110M, ¶ 43 (*cert. granted* Aug. 19, 2024). But the evidence "must be such as would support a reasonable inference" that the exception applies. *Roberts-Bicking*, ¶ 31.

¶ 21    We review de novo whether some evidence exists to support the instruction, viewing the evidence in the light most favorable to the giving of the instruction. *Galvan*, ¶ 33; *Roberts-Bicking*, ¶ 32.

### C.    Provocation

¶ 22    The provocation exception applies when, "[w]ith intent to cause bodily injury or death to another person, [the defendant] provokes the use of unlawful physical force by that other person." § 18-1-704(3)(a), C.R.S. 2024. This exception has three elements: "(1) the other person uses unlawful physical force against [the defendant]; (2) the defendant provoked the use of such physical force by the other person; and (3) the defendant intended his provocation to goad the other person into attacking him in order to

8

provide a pretext to injure or kill that person." *Galvan*, ¶ 19. Mumin argues there was no evidence to support the third element.

¶ 23    We agree with Mumin that the theory the prosecution relied on below — that his conduct toward the victim's *girlfriend* was intended to provoke the victim to attack him — is dubious. The question is not simply whether Mumin's conduct provoked the victim to attack him (the second element) but whether that was Mumin's intent, and further, whether Mumin's purpose in doing so was to create *a pretext* for injuring or killing the victim. *See id.*; *People v. Rios*, 2014 COA 90, ¶ 47 (noting that the defendant's conduct must be "intended to cause the victim to attack first").

¶ 24    The prosecution has not pointed to any evidence that Mumin attacked and threatened the victim's girlfriend to goad the victim — who was not even present at the time — to show up and attack him, all so Mumin could then shoot the victim in professed self-defense. And we question whether such an attenuated theory is a reasonable inference from the evidence. *See Roberts-Bicking*, ¶ 31. To the contrary, the only testimony on this point supported the most obvious theory — that Mumin was arguing with the girlfriend because he was upset with *her* for not paying him enough attention.

¶ 25    But, as the prosecution argues on appeal, the evidence also showed that, as the victim approached Mumin and before the victim physically attacked him, Mumin pointed the gun at the victim. *See People v. Dyer*, 2019 COA 161, ¶ 39 (noting that we may affirm on any ground supported by the record). Like in *Roberts-Bicking*, Mumin's act of pulling a gun on the victim as the victim confronted him could reasonably be interpreted as encouraging an escalation of the conflict that would end with Mumin shooting the victim. *See Roberts-Bicking*, ¶¶ 38-40. To be sure, that is not the only reasonable inference — there could have been other reasons Mumin pointed the gun. *See id.* at ¶ 40. But viewing the evidence in the light most favorable to the instruction, it is one reasonable interpretation that would support the provocation exception.

¶ 26    This interpretation is bolstered by other evidence suggesting that Mumin had a motive for attacking the victim. The victim's girlfriend testified that Mumin was romantically interested in her and "felt some type of way about" her dating the victim. Indeed, the argument that immediately preceded the shooting was based, at least in part, on her dating the victim and Mumin's feeling that she was not paying him enough attention as a result. This evidence

would give the jury further ground for inferring that, when the victim arrived, Mumin was looking for an excuse to attack him.

¶ 27    We of course express no opinion on what the *most* reasonable interpretation of Mumin's conduct was.  That question was for the jury.  *See id.*  But because there was some evidence that would support the application of the provocation exception, the district court correctly "provided the jury with [the] necessary legal principle to permit it to perform [its factfinding] function."  *Id.*

### D.    Initial Aggressor

¶ 28    A person is not justified in using physical force in self-defense if the person is the "initial aggressor."  § 18-1-704(3)(b).  When the jury is instructed on self-defense, an initial aggressor instruction is warranted when there is some evidence to suggest that the defendant "initiated the physical conflict by using or threatening imminent use of unlawful physical force."  *Roberts-Bicking*, ¶ 33.

¶ 29    Viewing the evidence in the light most favorable to the giving of the instruction, we conclude there was some evidence to support it. The video of the shooting shows Mumin pointing the gun at the victim as the victim was approaching Mumin — before the victim made any physical contact with Mumin.  A jury could reasonably

conclude from this video that Mumin initiated the physical conflict by brandishing the gun and thereby threatening the imminent use of unlawful physical force. *See id.* at ¶ 36 ("[M]erely *producing* the pistol during an argument was sufficient to warrant instructing the jury on initial aggressor principles."); *cf. Washington v. People*, 2024 CO 26, ¶ 29 (holding that evidence was sufficient to defeat self-defense where the defendant "introduced a weapon into an altercation that had, until that point, been a very brief fistfight").

¶ 30 Mumin contends that the victim's approach — which he characterizes as "aggressive" — was what initiated the physical conflict, and that by pointing the gun, Mumin was merely defending himself against the victim's implied threat. But again, while that may be one way to view the evidence, it is not the only way. *See Roberts-Bicking*, ¶ 34. The victim's approach could also be viewed as a verbal confrontation that only became physical when Mumin brought out the gun. And when the record permits either conclusion, the jury should be given an initial aggressor instruction and "be permitted to weigh the evidence to decide whether self-defense has been disproved." *People v. Newell*, 2017 COA 27, ¶ 28.

¶ 31    We therefore conclude that the district court did not err by instructing the jury on the initial aggressor exception.

### IV.    Heat of Passion Mitigator

¶ 32    Mumin next contends that the district court plainly erred by failing to sua sponte instruct the jury on the heat of passion mitigator to second degree murder.  We disagree.

### A.    Applicable Law and Standard of Review

¶ 33    Second degree murder is generally a class 2 felony, but it is a class 3 felony when it is committed "upon a sudden heat of passion, caused by a serious and highly provoking act of the intended victim, affecting the defendant sufficiently to excite an irresistible passion in a reasonable person." § 18-3-103(3)(b); *see also People v. Sepulveda*, 65 P.3d 1002, 1006 (Colo. 2003).

¶ 34    The district court must instruct the jury on the heat of passion mitigator "only if some evidence presented at trial supports it and the defendant requests it." *People v. Lee*, 30 P.3d 686, 689 (Colo. App. 2000).  To be entitled to such an instruction, the defendant must produce some evidence to establish each of four factors:

> (1) the act causing the death was performed upon a sudden heat of passion; (2) caused by a serious and highly provoking act of the

intended victim; (3) which was sufficient to excite an irresistible passion in a reasonable person; and (4) between the provocation and the killing, an insufficient interval of time passed for the voice of reason and humanity to be heard.

*Cassels v. People*, 92 P.3d 951, 956 (Colo. 2004).

¶ 35 We review de novo whether there is some evidence to support a heat of passion instruction, viewing the evidence in the light most favorable to the defendant. *See Castillo v. People*, 2018 CO 62, ¶ 32; *Cassels*, 92 P.3d at 955. Because Mumin did not request a heat of passion instruction at trial, we review his argument for plain error. *See Sepulveda*, 65 P.3d at 1006; *Lee*, 30 P.3d at 689.

## B. Analysis

¶ 36 Mumin argues that the victim's "aggressive behavior" toward Mumin — approaching him and then "swatt[ing], punch[ing], and grabb[ing] him" — was a highly provoking act that should have prompted the district court to give a heat of passion instruction.

¶ 37 But setting aside whether this conduct was such as would incite an objectively reasonable person with an "irresistible passion to kill," *Sepulveda*, 65 P.3d at 1007 (citation omitted), Mumin did not request such an instruction, *see Lee*, 30 P.3d at 689 (noting

14

that the jury need only be instructed on heat of passion if the defendant so requests). Nor did Mumin raise heat of passion in his defense. *See People v. Villarreal*, 131 P.3d 1119, 1127 (Colo. App. 2005) (holding that the jury must be instructed on heat of passion once the issue has been "injected into a case"). The district court therefore did not err — much less plainly — by failing to sua sponte instruct the jury on that theory of defense. *See Lee*, 30 P.3d at 689.

¶ 38     Indeed, a heat of passion instruction would have been inconsistent with Mumin's defenses at trial — that the shooting was accidental or that he acted in self-defense. Both of those defenses would have been undermined by the suggestion that Mumin shot the victim in a sudden heat of passion. A district court does not plainly err by "failing to instruct a jury in a manner inconsistent with a defendant's theory of defense." *Villarreal*, 131 P.3d at 1125.

## V.     Narration of Surveillance Video

¶ 39     Mumin next argues that the district court plainly erred by allowing a detective to narrate the series of events shown in the surveillance video. He contends that the detective's testimony constituted improper lay opinion. Because defense counsel was the

first to ask the detective to describe the events on the video, we conclude that any error was invited or, alternatively, not plain.

### A. Additional Background

¶ 40 On direct examination of the lead detective, the prosecution did not play the surveillance video or ask the detective to describe what the video showed. On cross-examination, defense counsel did.

¶ 41 After confirming that the detective had reviewed the video, defense counsel walked through the video, periodically pausing it to ask the detective what the video depicted. Among other things, defense counsel elicited testimony that (1) the victim walked briskly toward Mumin when he arrived; (2) Mumin backed up as the victim approached; (3) the "first aggressive" act "other than the approach" was the victim throwing a punch; (4) Mumin drew his gun after the victim threw the punch and then lowered it; (5) the victim tried to reach for the gun; (6) the victim did not back away when Mumin raised the gun; (7) the gunshot was not visible on the video; and (8) Mumin attempted to render aid after the victim was shot.

¶ 42 On re-direct, the prosecution sought to clarify the sequence of events — namely, that Mumin pointed the gun at the victim before the victim threw the punch. After reviewing her report, the

16

detective agreed. The prosecution then played the video again, similarly pausing it along the way for the detective to describe what she saw. Aided by the video, the detective testified that (1) Mumin walked toward the victim; (2) Mumin pointed the gun at the victim as he approached; (3) when Mumin raised his arm, the gun was in his hand; (4) the victim threw a punch after Mumin pointed the gun; and (5) Mumin introduced the threat of deadly physical force into the situation by pointing the gun at the victim. The prosecutor also elicited the detective's agreement that the video "is something that everyone can watch and make their own decisions on."

## B. Analysis

¶ 43 Mumin argues that the detective's narration of the surveillance video was improper lay opinion testimony because the detective had no firsthand knowledge of the shooting and was in the same position as the jurors to determine what the video showed. *See People v. Vergari*, 2022 COA 95, ¶ 19 (holding that it was improper for witness to narrate surveillance videos when "he was in the same position as the jurors when it came to discerning what [the] videos depicted"); *People v. McFee*, 2016 COA 97, ¶ 76 (holding that

17

testimony about what defendant said in recording was inadmissible when "it was based on exactly the same information the jury had").

¶ 44 But to the extent the detective's testimony was improper, defense counsel invited any error by eliciting such testimony first. *See People v. Rediger*, 2018 CO 32, ¶ 34 ("The doctrine of invited error prevents a party from complaining on appeal of an error that he or she has invited or injected into the case . . . ."). It was defense counsel who first played the video for the detective and asked her to weigh in on what it showed — in an apparent deliberate strategy to establish that the victim attacked Mumin first. *See People v. Chavez*, 2012 COA 61, ¶¶ 51-53 (holding that defendant invited putative error by choosing to "question prosecution witnesses on [the] issue in an attempt to elicit evidence"). Having done so, Mumin cannot now complain that the prosecution did the same thing in rebuttal. *See Rediger*, ¶ 34; *cf. People v. Dunlap*, 124 P.3d 780, 799 (Colo. App. 2004) ("When the defense opens the door to a topic, the prosecution has a right to explain or rebut any adverse inferences that might have resulted from the questions.").

¶ 45 Moreover, even if the error was not invited, it was not plain. First, it was not obvious that the district court should have sua

sponte limited the detective's testimony about the video after defense counsel had apparently made a strategic decision to elicit it. *Cf. Romero v. People*, 2017 CO 37, ¶ 8 (holding that prejudice was not so clear cut that district court should have sua sponte limited jury's access to recordings where "[t]here are many reasons a defendant may want a jury to have unfettered access" to them). Second, any error was not substantial because the jury saw the surveillance video, had access to it during deliberations, and could come to its own conclusion about what the video showed. *See McFee*, ¶ 78; *Vergari*, ¶ 20. Indeed, through redirect and again in closing, the prosecution encouraged the jury to do just that.

¶ 46 Mumin contends that the jury was more liable to defer to the detective's opinions because they embraced the ultimate issues of whether Mumin acted in self-defense and was the initial aggressor. But again, it was defense counsel who first asked the detective *directly* if the victim was the initial aggressor. *See Dunlap*, 124 P.3d at 799. And in any event, while portions of the detective's testimony — including that Mumin introduced the threat of deadly physical force by pointing the gun at the victim — may have touched on the ultimate issue, the detective did not opine on the

legal standard for self-defense or "tell the jury what result to reach."

*People v. Collins*, 730 P.2d 293, 306 (Colo. 1986). Rather, the

testimony was limited to factual responses about what the detective

saw in the video. *See id.* (holding that lay witness testimony that

there was no necessity to use a deadly weapon was permissible).

¶ 47     Thus, we conclude that the district court did not plainly err by

allowing the detective's testimony about the surveillance video.

### VI.     Timeline of Text Messages and Phone Calls

¶ 48     Mumin finally contends that the district court plainly erred by

admitting a timeline of text messages and phone calls to and from

the victim before and after the shooting. He argues that the exhibit

was not properly authenticated, constituted inadmissible hearsay,

and violated the best evidence rule. We discern no plain error.

### A.     Additional Background

¶ 49     The detective testified that police recovered five phones during

the investigation: two that belonged to the victim, one that belonged

to the girlfriend, and two that belonged to a third party. A digital

forensics investigator extracted the data from the phones pursuant

to a warrant. The detective then used that data to generate a

chronological report of text messages and phone calls sent or

received by the victim around the time of the shooting. The report listed the time of each text message and phone call, the content of each text message, and the duration of each call. The detective inserted a line labeled "homicide" to note the time of the shooting.

¶ 50    Before the report was admitted, the detective testified that she received the full extraction reports from the forensic investigator on discs, which were present (but not admitted) at trial. She testified that the information on those discs was voluminous and that the timeline was a fair and accurate summary of the calls and text messages around the time of the shooting, as reflected in the extraction reports (except for her addition of a "time stamp" for the "homicide"). The prosecution moved to admit the exhibit, defense counsel said she did not object, and the district court admitted it.

¶ 51    The exhibit showed nine calls between the victim and his girlfriend — five from the victim and four from the girlfriend — in the thirteen minutes before the shooting. It included one text message from the victim to his girlfriend twelve minutes before the shooting that said, "I know ur going thru it damn relax plz u don't have to take it out on me sheesh." It included two text messages from the victim to Mumin three minutes before the shooting that

said, "Bro why u sayin she gotta be by her self & shit like wtf bro all ur doing is goin to Robert," and "I'm tryin to talk to her too."

## B.    Analysis

¶ 52    Although the district court was not explicit as to its basis for admitting the timeline exhibit, it appears based on the foundation the prosecution laid that the exhibit was admitted under CRE 1006. Under that rule, the contents of voluminous evidence may be presented in the form of a chart or summary if (1) the evidence is sufficiently voluminous that in-court examination would be inconvenient; (2) the exhibit "summarize[s] the information contained in the underlying documents accurately, correctly, and in a nonmisleading manner"; (3) the underlying documents are "at least admissible, if not admitted"; and (4) the summary is not embellished by or annotated with conclusions or inferences that would render it argumentative. *Murray v. Just In Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶¶ 50-51 (citation omitted).

¶ 53    Mumin does not directly challenge the admissibility of the timeline under CRE 1006.[1]  But he effectively disputes the third condition — that the underlying evidence was admissible — by arguing that the underlying communications were not properly authenticated and constituted hearsay.  He also contends that the timeline violated the best evidence rule.  *See* CRE 1002.

¶ 54    We review the district court's evidentiary rulings, including its admission of a summary chart under CRE 1006, for an abuse of discretion.  *Murray*, ¶ 48.  Because Mumin did not object, we review for plain error.  *People v. Snelling*, 2022 COA 116M, ¶ 33.

### 1.    Authentication

¶ 55    Authentication requires "evidence sufficient to support a finding that the matter in question is what its proponent claims."

---

[1] In Mumin's reply brief, he more directly takes on the admission of the timeline under CRE 1006 by arguing that (1) the underlying documents were not voluminous; (2) the record does not establish that the summary was accurate; and (3) the titles on the timeline were argumentative.  We do not address these arguments as they were raised for the first time in a reply brief.  *People v. Owens*, 2024 CO 10, ¶ 90.  Even if we did, Mumin could not show plain error where the detective testified that the records were voluminous and the summary was accurate, and the titles — the victim as "victim" and Mumin as "suspect" — were relatively neutral labels that were consistent with other references to the men during trial.

CRE 901(a). The standard for authentication is "minimal — all that's required is a prima facie showing that the evidence is what its proponent claims." *Gonzales v. People*, 2020 CO 71, ¶ 42. Thus, evidence is admissible if "the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *Id.* at ¶ 27 (citation omitted). Once this burden is met, authenticity is a question for the jury. *Id.* at ¶ 6.

¶ 56 We conclude that the evidence in this case was sufficient to support a finding that the underlying communications were what the detective claimed they were — communications between the victim, his girlfriend, and Mumin. The forensic investigator testified that the data was downloaded from phones that the detective testified belonged to the victim and his girlfriend. *See People v. Abad*, 2021 COA 6, ¶¶ 44-45 (holding that such testimony was sufficient to authenticate data downloaded from cell phones). The detective also testified that the timeline accurately reflected the communications in the extraction report. *See People v. Heisler*, 2017 COA 58, ¶ 15. And other evidence corroborated the identity of the callers, including (1) the girlfriend's testimony about her calls to the victim before the shooting; (2) the substance of the text

messages, which indicates the sender's awareness of the ongoing argument between Mumin and the girlfriend; and (3) the timing of the texts in relation to when the victim confronted Mumin. *See id.*

¶ 57 Mumin contends that the communications were not properly authenticated because no witness with personal knowledge testified to the identity of the callers and senders.[2] The victim's girlfriend did testify to identity in a general sense by (1) testifying that she called the victim and (2) confirming the phone linked to her was in fact her phone. But more to the point, CRE 901 "does not prescribe any exclusive method for authenticating evidence." *Gonzales*, ¶ 30; *see also Heisler*, ¶ 15 (holding that text messages may be authenticated through "any other corroborative evidence under the circumstances"). It is enough that the evidence, as described above, was such that a jury could *reasonably find* that the communications were made by the referenced individuals. *Gonzales*, ¶ 27. Any questions on that point — and notably, none were raised — went to weight, not admissibility. *See Heisler*, ¶ 22.

---

[2] Mumin also emphasizes that the underlying extraction reports were not admitted into evidence. But under CRE 1006, the underlying documents need only be admissible, not admitted. *Murray v. Just In Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 50.

## 2.    Hearsay

¶ 58    Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  CRE 801(c).  Subject to many exceptions, hearsay is generally inadmissible.  CRE 802.

¶ 59    Mumin asserts that the text messages reflected in the report contained hearsay because they were offered to prove that Mumin "goaded [the victim] through [his girlfriend] into attacking him to kill him."  But even assuming the text messages were offered for that purpose, none of the messages asserted that fact.  The messages, for example, asserted that "ur going thru it," "u saying she gotta be by her self," and "I'm tryin to talk to her too."  The truth of these statements was not at issue.  To the extent a jury could infer from these statements that Mumin was attempting to goad the victim, that was a proper nonhearsay purpose.  *See People v. Cohen*, 2019 COA 38, ¶ 12 ("[A] statement isn't hearsay if it's offered for a purpose other than to prove the truth of the matter asserted . . . .").

¶ 60    In a footnote, Mumin asserts that the exhibit itself was hearsay within hearsay because the detective created it.  He does not develop this argument.  *See People v. Cuellar*, 2023 COA 20,

¶ 44 (noting that we do not generally address undeveloped arguments). But even if we consider it, we perceive no error. The forensic investigator testified that the extraction process involves "a tool that . . . decodes [the data on the cell phone] and makes it presentable." And the detective testified that she generated the summary with software, with her only input being the addition of the time stamp for "homicide." A computer-generated report involving no human input or interpretation is not hearsay because it involves no "statement" by a "declarant." *People v. Hamilton*, 2019 COA 101, ¶¶ 24, 26; *see also Abad*, ¶ 56 & n.5 (holding that cell phone extraction reports were not hearsay). Moreover, as long as the underlying extraction reports were admissible, an accurate summary of those reports was admissible as well. *See* CRE 1006.

¶ 61     Finally, even if we were to assume that some of the text messages were inadmissible hearsay,[3] and obviously so, any error would not be substantial. Neither the detective nor the prosecution ever mentioned the content of the text messages. The prosecution

---

[3] For example, if offered to prove that Mumin said "she gotta be by her self," the victim's text message to that effect might be hearsay. But nothing in the record suggests that this message was offered — much less obviously offered — to prove that assertion.

referred to the timeline once in closing — but only for the *timing* of two calls the girlfriend made to the victim minutes before the shooting. And on that point, the timeline was cumulative of the girlfriend's testimony. Given that the shooting was captured on video and the girlfriend's calls to the victim were not contested, we fail to see how Mumin was prejudiced by the admission of the timeline exhibit, much less to a degree that "cast[s] serious doubt on the reliability of the judgment of conviction." *Abad*, ¶ 43.

### 3. Best Evidence Rule

¶ 62    Mumin also asserts that the admission of the timeline violated the best evidence rule, which requires the "original writing" to prove its contents. CRE 1002; *see also Banks v. People*, 696 P.2d 293, 297 (Colo. 1985) ("The best evidence rule simply states a preference for the original writing in cases where the contents of the writing are directly in issue."). But because the timeline was admitted under CRE 1006, the best evidence rule does not apply. *Airborne, Inc. v. Denver Air Ctr., Inc.*, 832 P.2d 1086, 1090 (Colo. App. 1992).

### VII. Cumulative Error

¶ 63    Mumin contends that even if none of the alleged errors individually requires reversal, their cumulative effect deprived him

28

of a fair trial.  But reversal for cumulative error requires "multiple errors that collectively prejudice the substantial rights of the defendant." *Howard-Walker v. People*, 2019 CO 69, ¶ 25.  Because we have not identified any error, there is no cumulative error.  *Id.* And even those claimed errors we have assumed in the alternative (the video testimony and the hearsay) were no more substantial in the aggregate than they were individually.  *See id.* at ¶ 40.

## VIII.  Disposition

¶ 64     The judgment is affirmed.

JUDGE DUNN and JUDGE BROWN concur.