23CA0345 Peo v Matthews 02-05-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0345
Adams County District Court No. 20CR3018
Honorable Rayna Gokli McIntyre, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Christopher John Matthews,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Grove and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 5, 2026

Philip J. Weiser, Attorney General, Alejandro Sorg Gonzalez, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Chelsea E. Mowrer, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Christopher John Matthews, appeals the district court's judgment of conviction entered on a jury's verdict finding him guilty of second degree murder. We affirm.

## I.     Background

¶ 2     At the time of the shooting giving rise to the charges against Matthews in this case, Matthews and Tanner Banderet (the victim) had known each other for several years. Their relationship wasn't always friendly. At some point, according to Matthews and a coworker, Banderet sent messages to Matthews on Snapchat saying that he was going to go to Matthews' workplace and "shoot up the store."

¶ 3     Notwithstanding that history, however, late one night Matthews arranged to buy cocaine from Banderet, which he had done several times previously. Matthews picked up Banderet in his car. He later told police, and testified at trial, that he had a loaded gun on top of the center console. They drove to a gas station, and Matthews waited while Banderet went inside. Matthews testified that while he was driving from the gas station, he agreed to give Banderet about $1,200 in exchange for an ounce of cocaine. Matthews didn't want to count his money while driving, so he gave

Banderet all the cash he had — about $1,400. But Banderet didn't give him the drugs or his "change" (about $200). Instead, Matthews testified, Banderet gave him a "mean, vicious looking look" and slowly reached for Matthews' gun. Matthews quickly grabbed his gun and shot Banderet behind his left ear, killing him.

¶ 4    After killing Banderet, Matthews drove around for a while and eventually left Banderet's body in a cornfield. He thoroughly cleaned his car and went to his girlfriend's house, where he told her both that he had just killed Banderet and that Banderet had killed himself. He destroyed or disposed of evidence of the killing, including the clothes he had worn, Banderet's phone, and Banderet's driver's license. He then left Colorado for a couple of weeks. Matthews eventually returned to Colorado and turned himself in to the police.

¶ 5    By then, the police investigation had zeroed in on Matthews. They had reviewed Banderet's cell phone records and learned that he had been in contact with Matthews shortly before his body was found, and his cell phone had been turned off. A detective called Matthews while he was out of the state. Matthews said he had last talked to Banderet about a month before Banderet was killed and

2

that someone else had borrowed his car and phone on the night Banderet died.

¶ 6     When the police interviewed Matthews after he returned to Colorado, he told them a story that, while generally consistent with self-defense, was also, in some respects, inconsistent with that defense, with his previous telephone conversation with a police officer, and with his subsequent testimony at trial.

¶ 7     The People charged Matthews with first degree murder. Matthews' defense at trial was that he had acted in self-defense or because of a sudden provoking event. The jury found him guilty of the lesser included offense of second degree murder.

## II.   Discussion

¶ 8     Matthews contends that the judgment of conviction must be reversed because the district court erred by (1) admitting extrinsic evidence of bad character in violation of CRE 404(b) and (2) rejecting his attorney's requested jury instruction on heat of passion. We disagree with both contentions.

### A.   Jail Phone Call Evidence

¶ 9     Matthews contends that the district court erred by admitting a recording of a jail phone call between him and a friend in violation

3

of CRE 404(b) because the court didn't undertake the analysis required by *People v. Spoto*, 795 P.2d 1314 (Colo. 1990). We aren't persuaded.

### 1. Additional Background

¶ 10 When Matthews was being held in pretrial custody, his friend, Allie,[1] called him and they discussed statements his girlfriend had made to the police, as reported by a news agency. Allie told Matthews the following:

- Matthews' girlfriend had told police that she'd seen him visibly upset on the night of the shooting.

- His girlfriend said Matthews had told her Banderet had shot himself that night.

- When the police asked her whether she'd seen any blood that night, she said she had seen blood on Matthews' shirt and on his car's seats. But she explained to the police that Matthews always had blood on his shirt from

---

[1] Allie didn't testify at Matthews' trial. Her name appears in various forms in the record, including Aly, Ally, Allie, and her surname. We will refer to her as Allie.

some source and that she thought the blood on the seat was barbeque sauce.

- His girlfriend had also contacted a news agency to correct statements attributed to her in its story about the shooting because it had "misworded it completely."

¶ 11    Allie told Matthews that she had already told Matthews' girlfriend, "[T]hat's a mess she needs to fix and she needs to fix it fucking fast because you don't need any negative publicity." Matthews responded, "Make sure she fixes that and let her know that I am not contacting her until she fixes it." Allie said she told Matthews' girlfriend to "fix it fucking quick before we have something else to talk about — not in a threatening way just before I have to let her know I don't want you contacting him anymore." Matthews said, "Sit down and have a nice fucking cup of tea with her and have a nice conversation." Allie said, "[A]nd tell her 'I don't want you talking to [Matthews] anymore. You are toxic please just leave him the fuck alone.'" Matthews replied, "I appreciate the fuck out of you."

¶ 12    At trial, the prosecutor said she might seek to introduce a recording of the jail call "during the defense case." The next day,

the prosecutor said the issue of the jail call "would only come up if Mr. Matthews testifies." Later that day, when the issue was discussed again, Matthews' counsel objected, arguing that the call was irrelevant and that the quality of the recording was poor. The prosecutor countered that the recording was relevant because (1) Matthews' girlfriend had testified that she was still in a close relationship with Matthews, and some of her testimony was inconsistent with her prior statements; therefore, whether Allie told Matthews' girlfriend to "fix" her statements "and fix [them] fast" bore on her credibility as a witness; and (2) Matthews' own statements would always be relevant.

¶ 13 The court said that the recording "could potentially be relevant based on how Mr. Matthews testifies." The court also noted that the jury could "decide what context to give that or what meaning to give that conversation and those statements."

¶ 14 Matthews testified the following day. On cross-examination, the prosecutor asked him, "And you were upset with what [your girlfriend] had said[?]" Matthews replied, "In some way, shape, or form, I guess so. I believe in the media it was covered, not by what she said." The prosecutor then asked him, "Well, you wanted [your

girlfriend] to change her story[?]"  Matthews replied, "Her -- I didn't want her to change her story, no.  I wanted her to fix something in the news."

¶ 15    Following that exchange, the court admitted the recording of the call.

## 2.    Standard of Review

¶ 16    "We review a trial court's evidentiary rulings for an abuse of discretion."  *Rojas v. People*, 2022 CO 8, ¶ 16.  A court abuses its discretion if its ruling is manifestly arbitrary, unreasonable or unfair or is based on a misunderstanding or misapplication of the law.  *People v. Heredia-Cobos*, 2017 COA 130, ¶ 6.

## 3.    Applicable Law

¶ 17    "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *People v. Ray*, 2025 CO 42M, ¶ 21 (quoting CRE 401).  "Generally, all relevant evidence is admissible." *Id.* (citing CRE 402).  But "relevant evidence may be excluded if the risk of unfair prejudice substantially outweighs its probative value." *Id.* (citing CRE 403).

"[E]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character" but may be admissible for purposes such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

*Rojas,* ¶ 26 (quoting CRE 404(b)). In determining whether CRE 404(b) applies, we "must first determine if the evidence is intrinsic or extrinsic to the charged offense." *Rojas,* ¶ 52. If it is intrinsic, CRE 404(b) doesn't apply. And even if it is extrinsic, the rule doesn't apply unless it suggests a "propensity to commit the charged offense." *Rojas,* ¶ 52.

¶ 18    As also relevant in this case, CRE 608(b) precludes the admission of specific instances of a witness's conduct if offered to attack or support the witness's character for truthfulness. But that rule doesn't prohibit evidence of particular instances of conduct that specifically contradict a witness's direct testimony. *People v. Thomas,* 2014 COA 64, ¶¶ 42-43. Indeed, such evidence is admissible even if it would be inadmissible under CRE 404. *Id.* at ¶ 49.

## 4. Analysis

¶ 19    The recording, even if extrinsic to the offense, wasn't subject to CRE 404(b) because it didn't show "a propensity to commit the charged offense." *Rojas*, ¶ 52. The charged offense was murder; though the recording arguably made it appear that Matthews was attempting to tamper with a witness (as Matthews concedes), it didn't show a propensity to commit murder. Therefore, Matthews' CRE 404(b) argument necessarily fails: The court couldn't have erred by failing to undertake a *Spoto* analysis if the evidence wasn't subject to CRE 404(b) in the first place.

¶ 20    In any event, the evidence was admissible notwithstanding CRE 404(b) under the specific contradiction rule. The evidence could reasonably be interpreted to mean that Matthews wanted his girlfriend to change her story by "fixing" some things she had told others. Matthews had denied intending to do that when cross-examined by the prosecutor. Therefore, the evidence was potentially impeaching.

¶ 21    And the evidence was admissible to show consciousness of guilt. Evidence showing consciousness of guilt is admissible to show the defendant's commission of the offense. And such evidence

includes evidence of threatening, intimidating, or attempting to influence a witness. *See, e.g.*, *People v. Lowe*, 660 P.2d 1261, 1265 (Colo. 1983), *abrogated on other grounds by, Callis v. People*, 692 P.2d 1045 (Colo. 1984); *People v. Valera-Castillo*, 2021 COA 91, ¶ 39 n.8; *People v. Samuels*, 228 P.3d 229, 245 (Colo. App. 2009). The recording arguably suggests that Matthews was attempting to tamper with a witness, as Matthews expressly concedes. Therefore, it was admissible independent of any potential application of CRE 404(b).[2]

¶ 22    In sum, the court didn't abuse its discretion by admitting the recording.

---

[2] Courts from around the country invariably hold that such evidence is admissible, either for a proper purpose under some equivalent to CRE 404(b) or apart from such a rule. *See, e.g.*, *United States v. Jackson*, 70 F.4th 1005, 1013-14 (7th Cir. 2023); *United States v. Castleman*, 795 F.3d 904, 915 (8th Cir. 2015); *People v. Johnson*, 2021 IL App (1st) 190567, ¶¶ 7, 16-19 (involving a jailhouse call); *Burris v. State*, 47 A.3d 635, 666-67 (Md. Ct. Spec. App. 2012) (same), *rev'd on other grounds*, 78 A.3d 371 (Md. 2013); *State v. Butler*, 642 S.W.3d 364, 369-71 (Mo. Ct. App. 2022) (same); *State v. Yough*, 31 A.3d 271, 281 n.9 (N.J. 2011); *Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa. 2007); *State v. Rodriguez*, 259 P.3d 1145, 1151 (Wash. Ct. App. 2011).

## B. Failure to Instruct the Jury on Heat of Passion

¶ 23    Next, Matthews contends that the district court erred by refusing to give the jury a heat of passion instruction.  First, he argues that the court applied the wrong test in determining whether he was entitled to such an instruction.  Second, he argues that, under the proper test, he was entitled to such an instruction because there was some evidence supporting it.  We agree with Matthews that the district court applied the wrong test.  But we disagree with Matthews that there was some evidence supporting all elements of the heat of passion mitigator.  Therefore, the court didn't err by refusing to give the instruction.

### 1. Additional Background

¶ 24    Matthews' attorney asked the court to instruct the jury on the heat of passion mitigator.  Heat of passion is a mitigator rather than an affirmative defense because if the jury finds the defendant guilty of second degree murder but also finds that the prosecution hasn't disproved beyond a reasonable doubt that he acted under a sudden heat of passion, the offense is reduced from a class 2 felony to a class 3 felony.  § 18-3-103(3)(b), C.R.S. 2025; *see People v. Ramirez,*

56 P.3d 89, 94-95 (Colo. 2002); *People v. Garcia*, 28 P.3d 340, 346 (Colo. 2001).

¶ 25    Citing *People v. Sepulveda*, 65 P.3d 1002 (Colo. 2003), the prosecutor opposed the instruction for two reasons: Matthews had testified not to acting under an irresistible passion to kill but rather to acting in self-defense, and Matthews hadn't presented evidence of acts by Banderet sufficient to cause a reasonable person to act under an irresistible passion to kill.  Defense counsel argued that some evidence supported giving the instruction — specifically, Matthews' testimony that Banderet gave Matthews a menacing look, that Banderet reached for the gun on the console, and that he didn't have time to think before he shot Banderet.

¶ 26    The district court denied defense counsel's request for the instruction.  Apparently relying on *Sepulveda*, the court reasoned that the prosecution had proved that Matthews hadn't acted under a sudden heat of passion.  The court also refused to give the instruction because heat of passion requires the defendant to have "felt something" like that "defined in the heat-of-passion instruction," and Matthews had testified that he "just acted."

## 2.    Incorrect Test

¶ 27    Reviewing this issue de novo, *see People v. Vigil*, 2021 CO 46, ¶ 17,[3] we conclude that the district court didn't apply the correct test.

¶ 28    The district court misread, and the People now misread, *Sepulveda.*  In the passage the district court cited, the supreme court addressed the prosecution's evidentiary burden "[i]f the evidence raises the issue of provocation" — that is, after it is determined that the defendant is entitled to a heat of passion instruction.  *Sepulveda*, 65 P.3d at 1007.  It explained that when some evidence supports giving such an instruction, the prosecution's evidentiary burden is to disprove one or more of the mitigator's elements as set forth in section 18-3-103(3)(b) beyond a reasonable doubt.  *Sepulveda*, 65 P.3d at 1007.

---

[3] The People argue that we should review the question whether the district court applied the correct legal standard for an abuse of discretion.  But while we review for an abuse of discretion whether a court erred by refusing to give a particular instruction, a court may abuse its discretion in this context if it misapplies the law, *People v. Maloy*, 2020 COA 71, ¶ 54, and when, as in this case, the defendant asserts a misapplication of the law, we review that embedded question of law de novo, *see People v. Dominguez*, 2019 COA 78, ¶ 13.

¶ 29     But the test for determining whether a defendant is entitled to a provocation instruction is the same as it is for instructing the jury on an affirmative defense: "A provocation instruction is warranted whenever a defendant shows some supporting evidence — regardless of how incredible, unreasonable, improbable, or slight it may be — to establish each factor described in [section 18-3-103(3)(b)]." *Cassels v. People*, 92 P.3d 951, 956 (Colo. 2004); *see also Sepulveda*, 65 P.3d at 1006-07 ("[T]he record must reflect some evidence that would support the instruction.").

¶ 30     The district court therefore erred by denying defense counsel's request for the heat of passion instruction based on its evaluation of whether the prosecution had disproved the mitigator rather than whether there was some evidence supporting the mitigator's elements.[4]

¶ 31     But that error matters only if, applying the correct test, Matthews was entitled to the instruction.

---

[4] We are troubled by the People's refusal on appeal to acknowledge that the district court applied the wrong test. The law on the point is clear.

### 3. Entitlement to the Instruction

¶ 32    To support the court's giving of an instruction on provocation under section 18-3-103(3)(b), the defendant must show that there is some evidence supporting each of the following:

> (1) the act causing the death was performed upon a sudden heat of passion; (2) caused by a serious and highly provoking act of the intended victim; (3) which was sufficient to excite an irresistible passion in a reasonable person; and (4) between the provocation and the killing, an insufficient interval of time passed for the voice of reason and humanity to be heard.

*Cassels*, 92 P.3d at 956.

¶ 33    Reviewing this issue de novo, *Pearson v. People*, 2022 CO 4, ¶ 16, and viewing the evidence in the light most favorable to Matthews, *see Cassels*, 92 P.3d at 955, we conclude that Matthews didn't show that there was some credible evidence supporting at least two of the above elements — that the preceding act was (2)

serious and highly provoking and (3) sufficient to excite an irresistible passion in a reasonable person to kill the victim.[5]

¶ 34     The serious and highly provoking acts asserted by Matthews were Banderet's "mean, vicious looking look" followed by "reaching kind of slow," "sly-like" for Matthews' gun on the console. But there was no argument leading up to the shooting, Banderet didn't make any contemporaneous threats, and Banderet make didn't physical contact with Matthews. Nor did Banderet try to grab the gun from Matthews. These facts contrast unfavorably with those in other cases deemed to be sufficiently provoking. *See, e.g.*, *Cassels*, 92 P.3d at 957 (the victim followed, pushed, and insulted the

_____

[5] The parties dispute whether the emotion of fear, as opposed to, say, anger or jealousy, qualifies as "heat of passion." Colorado law on that issue isn't clear, and cases from other jurisdictions are split on the question. *Compare People v. Dominguez*, 281 Cal. Rptr. 3d 82, 92-93 (Ct. App. 2021) ("[I]mmediate fear and panic" can qualify.), *and State v. Esdel*, 317 A.3d 756, 767 (R.I. 2024) ("[A] reasonable fear of imminent death or serious bodily injury" can qualify.), *and Leggette v. State*, 892 S.E.2d 153, 160 (S.C. Ct. App. 2023) ("[F]ear immediately following an attack or threatening act" may qualify.), *with Beck v. State*, 852 S.E.2d 535, 540 (Ga. 2020) (Fear — even "fear that someone is going to pull a gun" — doesn't qualify. (citation omitted)), *and Jones v. State*, 413 So. 3d 587, 595-96 (Miss. Ct. App. 2025) (fear for one's life doesn't qualify), *and State v. Estelle*, 2021-Ohio-2636, ¶ 29 (Ct. App.) (shooting someone out of fear "rather than rage or passion" doesn't justify a provocation instruction). We don't need to resolve that dispute.

defendant and threatened to "beat him severely enough to require hospitalization"); *Edwards v. People*, 215 P. 855, 856-57, 862 (Colo. 1923) (the defendant saw the victim, who had previously threatened his family, repeatedly strike his mother with a club); *Henwood v. People*, 129 P. 1010, 1011-13 (Colo. 1913) (the victim punched the defendant, knocking him to the ground, and drew a gun); *Crawford v. People*, 20 P. 769, 771 (Colo. 1889) (lengthy physical fight between the defendant and the victim); *People v. Suazo*, 867 P.2d 161, 167 (Colo. App. 1993) (the victim physically attacked a close relative); *cf. Sepulveda*, 65 P.3d at 1007 (provocation instruction not warranted when the victim entered a home where a friend was cohosting a birthday party for the defendant after the victim had been told he wasn't welcome at the home, despite the history of animosity between the defendant and the victim); *People v. Moye*, 213 P.3d 652, 662-64 (Cal. 2009) (if the only evidence is that the defendant was attacked and consequently feared for his life, heat of passion doesn't apply); *People v. Flores*, No. B191172, 2007 WL 1599763, at *3 (Cal. Ct. App. June 5, 2007) (unpublished opinion) (provocation instruction not warranted when, "during the heated physical and verbal exchange between [the victim's ex-wife], [the

victim], and [the defendant], [the victim] lifted his shirt, causing [the defendant] to believe he was going to retrieve a weapon"); *State v. Ruffner*, 911 A.2d 680, 686-88 (R.I. 2006) (though there was evidence that the defendant was "very frightened" when he struck the victim with a table leg, his testimony indicated that "his actions were not the result of uncontrollable passion, but rather were motivated by an arguably very reasonable desire to protect himself from the knife-slashing [victim]").

¶ 35    The sole possible exception is *People v. Tardif*, 2017 COA 136, on which Matthews heavily relies.  In that case, the defendant's friend — a gang member — went to a park, where he got into an argument with a rival gang member (the victim) who made threats. *Id.* at ¶¶ 2-3.  The friend told the defendant, a fellow gang member, about the argument.  *Id.*  The defendant went to the park a few minutes later with a loaded gun.  *Id.*  He saw the victim "standing with his hands in his pockets, shirtless, and wearing a bandana the color of [the] rival gang over his face."  *Id.* at ¶ 24.  The defendant testified that the victim's "behavior was 'intimidating' and that 'nine out of ten times when somebody has a bandana on their face . . . they're gonna do something that they're not supposed to be doing

18

and try not to get caught for it.'"  *Id.*  The division concluded, without undertaking any analysis, that this evidence was sufficient to justify giving a provocation instruction.  *Id.* at ¶ 25.

¶ 36     We are, of course, not bound by the division's decision in *Tardif*.  *See Campbell v. People*, 2020 CO 49, ¶ 41; *People v. Thomas*, 195 P.3d 1162, 1164 (Colo. App. 2008).  But in any event, in this case, there was none of the gang history or prior argument deemed relevant in *Tardif*.  Nor were Banderet's hands anywhere near where he might have possessed his own weapon.

¶ 37     And there is no evidence, viewed objectively, *see People v. Dooley*, 944 P.2d 590, 594 (Colo. App. 1997), that Banderet's supposed ambiguous and tentative actions would excite a reasonable person to act under an irresistible passion to kill Banderet.  As the People point out, once Matthews had the gun, Banderet wasn't an immediate threat.

¶ 38     We also observe that Matthews consistently testified that he acted in self-defense, even when talking about his fear of Banderet. He said, for example, "It was him or me," "I shot [Banderet] because I was afraid he was going to kill me," and "I intended to save my own life and protect myself."

¶ 39    For these reasons, we conclude that the district court didn't err by denying Matthews' counsel's requested provocation instruction.

### III.   Disposition

¶ 40    The judgment of conviction is affirmed.

JUDGE GROVE and JUDGE SCHUTZ concur.