Bradley CASSELS, Petitioner,

v.

The PEOPLE of the State of Colorado, Respondent.

No. 03SC229.

Supreme Court of Colorado, En Banc.

June 28, 2004.

David S. Kaplan, Colorado State Public Defender, Alan Kratz, Deputy State Public Defender, Denver, Colorado, Attorneys for Petitioner.

Ken Salazar, Attorney General, Elizabeth Rohrbough, Assistant Attorney General, Denver, Colorado, Attorneys for Respondent.

Justice HOBBS delivered the opinion of the Court.

We granted certiorari in this case to review the court of appeals decision in *People v. Cassels*, No. 01CA0175, 2003 WL 192140 (Colo.App. Jan.23, 2003).[1] The court of appeals affirmed the trial court's judgment of conviction entered upon a jury verdict finding defendant Bradley Cassels guilty of second-degree murder for the death of his roommate, Greg Morris. We hold that the trial court should have instructed the jury on provocation and the doctrine of no-retreat because there was sufficient evidence in the case to support each instruction. We hold that the errors require reversal of Cassels' conviction because they deprived the defendant of the possibility of an acquittal, or alternatively, a shorter sentence.

## I.

According to his testimony at trial, from which the following account is taken, Cassels was unemployed and struggling to pay his bills in October, 1999. Morris, a former co-worker, agreed to let Cassels move into his apartment. The apartment was small, with only one bedroom and one entrance. Cassels and Morris agreed to split the rent and other expenses. Cassels slept in the only bedroom because Morris preferred sleeping on the couch in the living room.

By January, 2000, Cassels and Morris' relationship had deteriorated and become tense and volatile. Morris had started insulting Cassels, calling him a "mooch" and telling him he was not a very good person. The men agreed that Cassels would move out by the end of the month.

On January 11, 2000, Cassels was still living with Morris. He came home from work and went into his bedroom, where he drank two quarts of beer, played video games, and watched television. He subsequently went into the bathroom to take a shower. Morris returned home while Cassels was in the shower. Morris "stormed" into the bathroom like a "wild man," pulled open the shower curtain, yelled something unintelligible to Cassels, and then walked out.

Cassels got out of the shower and wrapped himself in a towel. He walked into the living room and told Morris that the bathroom was available. Morris replied that he did not want to use the "fucking bathroom." Morris began yelling at Cassels, calling him a "no good son of a bitch" and a "low-life," among other things. Morris also told Cassels that the two of them were going to fight. Morris threatened to "beat the hell out of" Cassels and "put him in the hospital." Cassels told Morris that he did not want to fight and returned to his bedroom to put on some clothes.

Before Cassels had time to get dressed, Morris burst through the bedroom door. Morris continued to threaten Cassels and started pushing and shoving him. Still undressed, Cassels made his way back into the living room. Morris followed Cassels again and continued to push him and threaten him.

As the incident continued, Morris positioned himself in front of the only exit from the apartment. He stood next to an iron bar that he previously told Cassels would make a good weapon. Cassels had never seen Morris in such a rage and became afraid that Morris was going to assault him. Cassels went to his bedroom and retrieved a loaded gun with the intent to frighten Morris and cause him to calm down and stop threatening and pushing him. When Cassels exited his room with the gun, he "freaked out" and "lost it." He shot Morris nine times, emptying the gun.

Cassels testified he did not remember shooting Morris. When Cassels saw Morris lying on the floor of the living room, he called

---

1. We granted certiorari on the following issues:
   1. Whether the petitioner's right to due process of law and trial by jury were violated when the trial court refused, over defense objection, to instruct the jury on the elements of provocation and heat of passion.
   2. Whether the trial court committed reversible error and violated the petitioner's right to due process of law by refusing the petitioner's tendered instruction informing the jury that, where he is not the initial aggressor, a defendant is under no duty to retreat to a position of no escape before he may act in self-defense.

911 and told the dispatcher that he shot his roommate. Morris did not survive the gunfire.

The prosecution charged Cassels with one count of first-degree murder pursuant to section 18–3–102, 6 C.R.S. (2000), one count of second-degree murder pursuant to section 18–3–103, 6 C.R.S. (2000), and two counts of crime of violence pursuant to section 16–11–309, 6 C.R.S. (2000).[2]

At trial, the court instructed the jury to consider whether Cassels acted in self-defense. But, the trial court refused the defense's request to instruct the jury on provocation through a special interrogatory.[3] The trial court ruled that "the shooting has to result as from the sudden heat of passion that Mr. Cassels was so overcome by this serious and highly provoking act ... that he responded without time to think. And that's not what happened." The trial court based its ruling on the fact that Cassels retrieved his gun for a particular purpose—to scare Morris—which showed he had time think about his actions.

The trial court also refused to deliver a defense-requested no-retreat instruction.[4] The trial court reasoned that the instruction was not required because it found that: (1) the standard self-defense instruction was suf-

ficient; (2) an instruction on retreat is only warranted when the defendant is the initial aggressor; and (3) the instruction as tendered was inappropriate because it contained language about the defendant being where he had a right to be, which was not at issue in the case.

The jury found Cassels guilty of second-degree murder. The trial court entered judgment of conviction on the jury verdict and sentenced Cassels to forty years in the Department of Corrections. On appeal, Cassels challenged the trial court's refusal to instruct the jury on the provocation mitigator and the doctrine of no-retreat. Finding no error, the court of appeals upheld Cassels' conviction and sentence.

## II.

We hold that the trial court should have instructed the jury on provocation and the doctrine of no-retreat because there was sufficient evidence in the case to support each instruction. We hold that the errors require reversal of Cassels' conviction because they deprived the defendant of the possibility of an acquittal, or alternatively, a shorter sentence.

---

**2.** Section 16–11–309 was relocated to section 18–1.3–406 effective October 1, 2002.

**3.** Cassels requested that the trial court give two instructions on provocation. The first was a special interrogatory to be included with the elemental jury instruction on second-degree murder:

> If you conclude that Mr. Cassels committed second-degree murder, then you must determine whether the act was committed
> 1. under circumstances where the act causing death was performed under a sudden heat of passion,
> 2. which was caused by a serious and highly provoking act of the intended victim,
> 3. affecting the defendant sufficiently to excite an irresistible passion in a reasonable person,
> 4. and there was no interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard.
> 5. without the affirmative defense in instruction number _____.
>
> If you find that Mr. Cassels has committed second-degree murder, in order to reject the

circumstances listed above, the People must establish, beyond a reasonable doubt, that Mr. Cassels did not act under the above-listed circumstances involving a provoking act and a heat of passion.

The second instruction was substantively the same, but was formatted as a general instruction rather than a special interrogatory. It instructed the jury to consider the issue of provocation if it found Cassels guilty of second-degree murder and informed the jury of each element of the provocation mitigator and of the prosecution's burden to disprove each element beyond a reasonable doubt.

**4.** Cassels requested the following instruction:

> Where the defendant is the initial aggressor he must, in order to rely on self-defense, have withdrawn from the affray and have communicated the desire to withdraw to his opponent. However, if the defendant was not the initial aggressor, and was where he had a right to be, he was not required to retreat to a position of no escape in order to claim the right to employ force in his own defense.

## A. Applicable Law

We first address the standard of review applicable to requested defense jury instructions; we then turn to the law of provocation and the doctrine of no-retreat.

### 1. Defense–Requested Jury Instructions

■ The trial court has a duty to correctly instruct the jury on all matters of law for which there is sufficient evidence to support giving instructions. *People v. Garcia,* 28 P.3d 340, 343 (Colo.2001). When considering whether a defendant is entitled to requested instructions, we consider the evidence in the light most favorable to the defendant. *Mata–Medina v. People,* 71 P.3d 973, 979 (Colo.2003). A defendant is entitled to instructions on a certain statutory grade of criminal homicide as long as there is any supporting evidence, regardless of how incredible, unreasonable, improbable, or slight it may be. *Id.* (quoting *Read v. People,* 119 Colo. 506, 509, 205 P.2d 233, 235 (1949) and *Crawford v. People,* 12 Colo. 290, 293, 20 P. 769, 770 (1889)). A defendant is entitled to an instruction on a particular affirmative defense when he or she raises some credible evidence to support it. § 18–1–407(1), 6 C.R.S. (2003); *Gorman v. People,* 19 P.3d 662, 668 (Colo.2000).

### 2. Provocation and Second–Degree Murder

Prior to 1996, our criminal code contained a separate offense named heat of passion manslaughter. Ch. 295, sec. 13, § 18–3–104, 1996 Colo. Sess. Laws 1840, 1844–45. The manslaughter statute provided that:

(1) A person commits the crime of manslaughter if:

. . .

(c) Such person knowingly causes the death of another person under circumstances where the act causing the death was performed upon a sudden heat of passion, caused by a serious and highly provoking act of the intended victim, affecting the person who performs the killing suffi-

ciently to excite an irresistible passion in a reasonable person; but, if between the provocation and the killing there is an interval sufficient for the voice of reason and humanity to be heard, the killing is murder.

§ 18–3–104, 8B C.R.S. (1995 Supp.); Ch. 295, sec. 13, § 18–3–104, 1996 Colo. Sess. Laws 1840, 1844–45. Heat of passion manslaughter was classified as a class 3 felony. § 18–3–104; Ch. 295, sec. 13, § 18–3–104, 1996 Colo. Sess. Laws 1840, 1844–45.

The General Assembly amended our criminal code in 1996 and eliminated the separate offense of heat of passion manslaughter. A homicide committed in the heat of passion, or upon provocation, is now treated as a less culpable form of second-degree murder.[5] Thus, the issue of provocation is treated as a factor in mitigation of second-degree murder affecting the applicable felony classification, and is located within section 18–3–103. § 18–3–103(3)(b), 6 C.R.S. (2003); *People v. Ramirez,* 56 P.3d 89, 94 (Colo.2002).

The current second-degree murder statute provides that:

(1) A person commits the crime of murder in the second degree if the person knowingly causes the death of a person.

. . .

(3)(a) Except as otherwise provided in paragraph (b) of this subsection (3), murder in the second degree is a class 2 felony.

(b) Notwithstanding the provisions of paragraph (a) of this subsection (3), murder in the second degree is a class 3 felony where the act causing the death was performed upon a sudden heat of passion, caused by a serious and highly provoking act of the intended victim, affecting the defendant sufficiently to excite an irresistible passion in a reasonable person; but, if between the provocation and the killing there is an interval sufficient for the voice of reason and humanity to be heard, the killing is a class 2 felony.

§ 18–3–103. If found by the jury, the mitigator reduces a conviction for second-degree

---

5. The terms "heat of passion" and "provocation" are used interchangeably in our previous cases in referring to the mitigator instruction. For pur-

poses of consistency, we choose to use the term provocation instruction throughout this opinion.

murder from a class 2 to a class 3 felony. § 18–3–103(3)(b). This reduces the presumptive sentencing range from eight to twenty-four years to four to twelve years. § 18–1.3–401, 6 C.R.S. (2003).

A provocation instruction is warranted whenever a defendant shows some supporting evidence—regardless of how incredible, unreasonable, improbable, or slight it may be—to establish each factor described in subsection (3)(b) of the second-degree murder statute. *Mata–Medina*, 71 P.3d at 979; *People v. Garcia*, 826 P.2d 1259, 1262 (Colo. 1992). Specifically, the defendant must produce evidence in support of the second-degree murder mitigator showing that: (1) the act causing the death was performed upon a sudden heat of passion; (2) caused by a serious and highly provoking act of the intended victim; (3) which was sufficient to excite an irresistible passion in a reasonable person; and (4) between the provocation and the killing, an insufficient interval of time passed for the voice of reason and humanity to be heard. § 18–3–103(3)(b).

◼ When the jury is instructed on the mitigator, the prosecution bears the burden of disproving the mitigating factors beyond a reasonable doubt. *People v. Sepulveda*, 65 P.3d 1002, 1007 (Colo.2003). The jury will be asked to complete a special verdict form that indicates its finding as to the presence or absence of the mitigating circumstances. Robert J. Dieter, Colorado Criminal Practice and Procedure § 18.163 (1996 Supp.2003).

◼ It is the function of the jury, not the trial court, to weigh and consider the evidence to determine which grade of criminal homicide, if any, the defendant committed. *Mata–Medina*, 71 P.3d at 979 (quoting *Read*, 119 Colo. at 509, 205 P.2d at 235). Therefore, unless there is an absence of evidence in support of the mitigating factors, the trial court's failure to instruct the jury on provocation is error. *Id.* (quoting *Read*, 119 Colo. at 509, 205 P.2d at 235); *People v. Shaw*, 646 P.2d 375, 379 (Colo.1982) (quoting *Crawford*, 12 Colo. at 292, 20 P. at 770).

### 3. No–Duty to Retreat

◼ Defendants are entitled to raise the affirmative defense of self-defense to justify the use of physical force-including deadly force-whenever the record contains any credible evidence tending to establish the defense. § 18–1–407(1); *Idrogo v. People*, 818 P.2d 752, 754 (Colo.1991). The trial court must tailor the self-defense instructions to the particular circumstances of the case in order to adequately apprise the jury of the law of self-defense from the standpoint of the defendant. *Garcia*, 28 P.3d at 347. In cases where the jury could reasonably conclude that the defendant had a duty to retreat before using force in self-defense, the defendant may be entitled to a self-defense instruction tailored to address the issue of retreat. *See id.* at 348.

◼ Colorado follows the doctrine of no-retreat, which permits non-aggressors who are otherwise entitled to use physical force in self-defense to do so without first retreating, or seeking safety by means of escape. *People v. Toler*, 9 P.3d 341, 350–51 (Colo.2000). In Colorado, only initial aggressors must retreat before using force in self-defense. *Id.* at 351. A defendant is entitled to a jury instruction on the doctrine of no-retreat when the facts of the case raise the issue of retreat and the evidence supports a jury finding that the defendant was not the initial aggressor. *Garcia*, 28 P.3d at 348; *Toler*, 9 P.3d at 352.

◼ A trial court's failure to instruct the jury on the doctrine of no-retreat in cases where the defendant was not the initial aggressor creates a risk that the jury will not acquit the defendant because it will consider the defendant's use of force unreasonable in light of the possibility of retreat. *Toler*, 9 P.3d at 352. Moreover, a standard self-defense instruction does not adequately apprise the jury that a defendant who is not the initial aggressor does not need to retreat before using force in self-defense. *Idrogo*, 818 P.2d at 756. When a trial court objects to the wording of an instruction that a defendant requests and is entitled to, the court commits error by failing to ensure that the jury in a criminal case receives a proper alternative instruction that correctly sets forth the applicable rule. *Id.* at 757.

**B. The Defense Requested Instructions Should Have Been Given and the Errors Require Reversal of Cassels' Conviction**

Cassels presented sufficient evidence at trial to support his requested instructions on provocation and the doctrine of no-retreat. The trial court erred by refusing to give his requested instructions or tailor them appropriately. The trial court's errors require Cassels' conviction to be reversed.

### 1. Provocation Instruction

■ Cassels presented evidence to support each statutory factor of the second-degree murder mitigator. First, on the night of the shooting, Cassels told a detective that "he just lost it" and was so angry that he just "freaked out." The prosecution concedes that this evidence sufficiently supports Cassels' claim that he shot Morris upon a sudden heat of passion.

Second, Cassels presented evidence to support that his actions were caused by a serious and highly provoking act sufficient to excite an irresistible passion in a reasonable person. Cassels testified that Morris followed him around the apartment, pushing and shoving him and threatening to beat him severely enough to require hospitalization. Moreover, Morris positioned himself in front of the only exit from the apartment and next to an iron bar that he previously said would make a good weapon. Morris insulted Cassels repeatedly, calling him a mooch, a low-life scum, and a loser, among other things. Cassels was naked during the entire incident, with only a towel wrapped around his body. He was therefore in a highly vulnerable position. Toxicology tests conducted after the shooting showed that Morris was highly drunk on the evening of the shooting, which supports Cassels' claim that Morris was acting like a wild man. Taken together, this evidence is sufficient to allow the jury to determine whether Morris' actions amounted to an adequate provocation.

Third, there is evidence that supports Cassels' claim that between the provocation and the shooting, an insufficient interval of time passed for the voice of reason and humanity to be heard. Cassels testified that only seconds lapsed between the initial provoking act and the time of the shooting. In addition, Cassels retrieved the gun from within the small apartment and therefore only traveled a small distance before opening fire on Morris. And, Morris' body was still positioned in front of the exit and adjacent to the iron bar after the shooting. This tends to show that the shooting took place during the course of the incident and before Cassels had time to regain self-control. This evidence is sufficient to allow the jury to consider whether Cassels had "cooled-off" at the time of the shooting.

Considering the evidence in the light most favorable to Cassels, *Mata–Medina*, 71 P.3d at 979, we conclude that he presented sufficient evidence in support of each factor of the mitigator. *See Rowe v. People*, 856 P.2d 486, 492 (Colo.1993) (holding that defendant was entitled to raise the issue of provocation as a sentence mitigator, and to receive a jury instruction on heat of passion, where defendant was charged with first-degree assault for shooting the victim through a locked door in response to obscenities and pounding on the door). Therefore, the trial court erred by refusing to instruct the jury on provocation. *Mata–Medina*, 71 P.3d at 979 (quoting *Read*, 119 Colo. at 509, 205 P.2d at 235).

### 2. No–Duty to Retreat Instruction

■ The trial court refused to instruct the jury on the doctrine of no-retreat because it misconstrued the law, and not because the instruction was unwarranted by the facts of the case. First, the trial court concluded that an instruction on retreat is only appropriate when the defendant is the initial aggressor. Second, the trial court determined that the standard self-defense instruction was sufficient, and that therefore, giving an additional instruction on retreat would be redundant. Third, the trial court considered the instruction, as tendered, to be inappropriate.

The trial court's reasons for refusing to instruct the jury on the doctrine of no-retreat contravene our precedent. We have specifically held that the standard self-defense instruction, like the one given in this case, does

not adequately apprise the jury that a defendant who is not the initial aggressor does not need to retreat before using force in self-defense. *Idrogo*, 818 P.2d at 756. We have also specifically held that the trial court must tailor the self-defense instruction in light of the particular facts of the case. *Garcia*, 28 P.3d at 347. And, we have held that the trial court should not refuse to give an instruction because of the particular wording the defendant selected. *Idrogo*, 818 P.2d at 757.

Moreover, the facts of this case support giving a no-retreat instruction. It is undisputed that Cassels was not the initial aggressor. Despite the conclusion of the trial court and court of appeals in this case, it is precisely in this circumstance that a defendant is entitled to an instruction on the doctrine of no-retreat. *See Toler*, 9 P.3d at 350–51. In addition, the trial court imposed an aggravated sentence based, in part, on its finding that Cassels could have ran out the door, or, when he went to his room to retrieve the gun, he could have shut the door, put on clothes, and barricaded himself in his room. The trial court's findings show that a reasonable jury could have similarly concluded that Cassels had an opportunity to escape the situation but chose not to.

Lastly, the prosecution characterized the events leading up to the shooting in a way that could influence a reasonable jury to infer that Cassels could have escaped the situation, but chose to engage in violence instead. In arguing that Cassels acted in deliberation and was therefore guilty of first-degree murder, the prosecution told the jury that Cassels made a "conscious decision" to retrieve his gun and a "conscious decision" to return to the living room with the gun. The prosecution also told the jury that Morris did not follow Cassels into his room. This suggested to the jury that Cassels could have sought safety from Morris in his bedroom rather than defending himself.

█ After reviewing the record in the light most favorable to Cassels, *Mata–Medina*, 71 P.3d at 979, we conclude that the facts of the case support an instruction on the doctrine of no-retreat; therefore, the trial court erred in refusing to give the instruction. We must now determine whether the trial court's error was harmless. When the trial court errs in refusing a defense-requested self-defense instruction that is justified by the evidence, we reverse the conviction and remand for a new trial unless the error does not affect substantial rights of the defendant and is therefore harmless. *Garcia*, 28 P.3d at 344, 348. We conduct our inquiry in light of the entire trial record to ascertain whether it can be said with fair assurance that the error did not substantially influence the verdict or impair the fairness of the trial. *Cordova v. People*, 817 P.2d 66, 74 (Colo.1991).

The trial court found that the jury should consider the question of whether Cassels' use of force against Morris was justified and therefore ruled that Cassels was entitled to a self-defense instruction. The facts of this case raised the issue of retreat. Even the trial court concluded that Cassels could have escaped from the danger of the incident but chose not to. However, the trial court failed to tailor Cassels' self-defense instruction to address the issue of retreat. *Garcia*, 28 P.3d at 347.

Thus, although Cassels received a self-defense instruction, the jury could have inferred that Cassels was not entitled to an acquittal on grounds that he should have retreated or otherwise attempted to escape the situation. In light of the entire trial record, we cannot conclude with fair assurance that the trial court's failure to properly instruct the jury on the applicable law of self-defense did not deprive Cassels of the right to an acquittal on the ground of self-defense. *Cordova*, 817 P.2d at 74; *Idrogo*, 818 P.2d at 756.

We conclude that the instruction error regarding the doctrine of no-retreat was not harmless because there is a reasonable probability that the error contributed to Cassels' conviction.

III.

Accordingly, we reverse the judgment of the court of appeals, set aside Cassels' conviction for second-degree murder, and re-

mand the case for further proceedings consistent with this opinion.

Justice COATS dissents, and Justice KOURLIS joins in the dissent.

Justice COATS, dissenting:

The majority reverses the defendant's conviction of second degree murder both because the jury was not given a chance to decide whether he was provoked beyond reason by the victim, and because the jury was not instructed that he was permitted to shoot the victim rather than retreat. Even the defendant conceded that after being confronted by the unarmed and extremely drunken victim, in whose apartment he was temporarily staying and who at worst reviled, threatened, and shoved him, he retrieved his loaded, 9mm automatic handgun from the bedroom and shot the victim nine times. Because I do not believe there was any evidence whatsoever from which reasonable jurors could find the killing to be justifiable, or even to be explainable as the result of an irresistible passion provoked by the victim, I respectfully dissent.

Because the defendant called 911 almost immediately after emptying his 9mm automatic into his apartment mate, the police were able to physically substantiate that he shot the victim nine times—five time in the back—in his living room; there was no evidence that the victim had been armed; and when the victim's body was tested, it still had a blood-alcohol content nearly five times the legal limit for driving. No one else was present at the time of the homicide and the victim was, of course, not available to testify. The majority's description of the confrontation between the victim and defendant, leading to the killing, comes solely therefore from the defendant's testimony, although it has never been found accurate or credible by any trier of fact. While I do not suggest that the defendant's testimony alone could never be sufficient to support instructions on self-defense and provocation, I find no support for either instruction in the defendant's account given under oath at trial.

With regard to self-defense, the defendant clearly used deadly force against the victim in shooting and killing him. By the defendant's own account, the victim was never armed with a gun, knife, bludgeon, or any other object that could be used as a weapon, and at no time did he either attempt to or threaten to arm himself. At most, the defendant's testimony indicated that he (rather than the victim) noticed (during the early part of their confrontation rather than after returning with the loaded gun) the presence, in the room, of an iron bar, which the defendant recalled the victim observing (at some unspecified time in the past) could be used as a weapon.

As conceivably applicable to the circumstances of this case, a person is entitled to defend himself with deadly physical force *only* when he has reasonable grounds to believe that he is in *imminent* danger of being killed or receiving great bodily injury. See § 18–1–704(2)(a), 6 C.R.S. (2003). Even according to his own account, the defendant did not retrieve his gun and shoot the victim because he believed himself to be in imminent danger of being killed or severely injured but rather because he wanted to frighten the victim into calming down and letting him leave the apartment. And even if the defendant subjectively believed himself to be in imminent danger of serious injury, in light of his own testimony, such a belief would not have been objectively reasonable. Without parsing the merits of a separate, "no retreat" instruction under these circumstances, I would therefore find that the defendant was not entitled to an instruction on self-defense at all.

I would find that the jury was similarly prohibited, by the defendant's own testimony, from considering the question of irresistible passion, or legally cognizable provocation. In this jurisdiction, second degree murder is merely a class three (rather than a class two) felony if the defendant is actually moved by a serious and highly provoking act of the victim and kills him too quickly for the voice of reason and humanity to be heard, and if the highly provoking act of the victim also would have excited an irresistible passion in a reasonable person. See § 18–3–103(b), 6 C.R.S. (2003). The defendant never testified that he was provoked beyond his capacity to resist,

but rather that despite being angry, he retrieved his gun from the bedroom with the intent of frightening rather than shooting the victim. On the stand, he could not recall even killing the victim, much less the reasons why he did so. While the defendant's testimony may have supported a claim that he lacked the culpable mental state required for conviction of murder, or perhaps that his automaton-like state prevented him from committing any voluntary act at all, it most certainly did not support a claim that he intentionally killed the victim upon a sudden and irresistible heat of passion.

Perhaps more importantly, however, there was absolutely no evidence at trial from which the jury could have found any conduct by the victim that the law is prepared to recognize as exciting an irresistible passion in an objectively reasonable person. It has long been accepted that mere words, at least words that revile, disparage, or insult, rather than words that communicate information, can never rise to the level of legal provocation. *See United States v. Frady*, 456 U.S. 152, 174, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)("Mere words, however, no matter how insulting, offensive or abusive, are not adequate to induce a homicide although committed in passion, provoked, as I have explained, from murder to manslaughter.")(internal quotations omitted). Although threats, when combined with the present ability to carry them out, may permit certain responses in self-defense, they are not, in themselves, highly provoking. *See id.* ("In addition to the great provocation, there must be passion and hot blood caused by that provocation."); *see also, State v. Bonano,* 59 N.J. 515, 284 A.2d 345, 350 (1971)(verbal threat not sufficient to reduce homicide to manslaughter). Even when combined with conduct that may amount to a technical or minor assault or battery, insults or threats are generally held, for obvious reasons, not to be provocation sufficient to mitigate murder to what was formerly called manslaughter. *See, e.g., People v. Chevalier*, 131 Ill.2d 66, 136 Ill.Dec. 167, 544 N.E.2d 942, 944 (1989)("serious provocation includes substantial physical injury or assault, mutual quarrel or combat ..."); *State v. Guebara*, 236 Kan. 791, 696 P.2d 381, 386 (1985)(mere words or gestures

are not enough, and if assault or battery is involved, the defendant must have a reasonable belief that he or she is in danger of suffering great bodily harm or at the risk of death); *State v. Bealer,* 2003 WL 1956089, *5 (Ohio Ct.App.2003)(court held that defendant's statement that victim hit him, shoved him and slapped him, was not serious provocation which would reasonably incite a person to use deadly force); *State v. Salmon*, 140 N.C.App. 567, 537 S.E.2d 829, 833–34 (2000)("victim's statement to the defendant that the victim would have sex with defendant's sister and the victim's shoving of the defendant were not an assault or threatened assault to amount to legal provocation").

Taken as completely true and accurate, the defendant's testimony was that the victim never struck him any blow or caused him any physical pain or injury from which he was still smarting at the time of the killing. As a matter of law, I would find that neither the words nor the shoving described by the defendant were sufficient to provoke the sudden and irresistible passion contemplated by the General Assembly. While a defendant may not be legally barred from submitting alternate and inconsistent theories to a jury, he is not entitled to have the jury instructed in a manner that is inconsistent with his own testimony. *See People v. Garcia,* 826 P.2d 1259, 1263 (Colo.1992).

Because I believe the majority rationale departs from long-established principles of self-defense and provocation, and because I do not believe the statutory scheme contemplates that courts allow juries the option of finding either under the circumstances of this case, I respectfully dissent.

I am authorized to state that Justice KOURLIS joins in the dissent.