22CA1584 Peo v Li 04-02-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1584
City and County of Denver District Court No. 19CR4437
Honorable Brian R. Whitney, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Lin F. Li,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE GROVE
Yun and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 2, 2026

---

Philip J. Weiser, Attorney General, Majid Yazdi, Senior Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Taylor J. Hoy, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Lin F. Li, appeals the judgment of conviction entered after a jury found him guilty of second degree murder.  We affirm.

## I.    Background

¶ 2    A reasonable jury could have found the following facts based on the evidence presented at trial.

¶ 3    Li went to a house party with several other people.  Police were called, and when they arrived, the guests dispersed.  Li got into a vehicle — a three-row SUV — with six other people, and the group drove to a nearby parking lot, where they remained sitting in the parked car.

¶ 4    The group was trying to listen to music, but the victim, Daoud Francis, was talking on his phone.  Francis was sitting in the same row as Li and was drunk, belligerent, and argumentative.  When Li told Francis to get off the phone, Francis responded, "Shut up, bitch."  The two exchanged heated words, with Francis telling Li to shut up and again calling him a "bitch."  Li then "pistol-whipped" Francis two to four times.

¶ 5    According to Li, Francis fought back and so, fearing for his safety, he put the gun to Francis's head, where it accidentally

1

discharged.  Another witness in the car told a different story, explaining that, after Li pistol-whipped Francis, "[t]he clip fell out of the gun and [Li] put the clip back in the gun and he said, I'm going to fuck'n kill you and then pulled the trigger."

¶ 6     Li was charged with first degree murder.  At trial, the court instructed the jury on the lesser included offenses of second degree murder and reckless manslaughter.  The jury found Li guilty of second degree murder and the court sentenced him to forty-eight years in the custody of the Department of Corrections.

¶ 7     Li now appeals, arguing that (1) he was entitled to a jury instruction on heat of passion provocation as a mitigating factor for the murder charges; (2) the court plainly erred by failing to sua sponte instruct the jury on the affirmative defense of self-defense; (3) the prosecution committed misconduct during closing argument; and (4) the court erroneously excluded an unavailable witness's out-of-court statements.

## II.     Heat of Passion Jury Instruction

¶ 8     Li contends that the court erroneously denied his request for a jury instruction on heat of passion as a mitigator to the murder charges.  We disagree.

2

### A. Standard of Review and Applicable Law

¶ 9    Second degree murder is a class 2 felony, but it is reduced to a class 3 felony if the jury finds the heat of passion mitigator applies. § 18-3-103(3)(b), C.R.S. 2025. A trial court should instruct the jury on heat of passion if there is some credible evidence that (1) the defendant committed the offense in a sudden heat of passion (2) caused by a serious and highly provoking act of the victim, (3) which would excite an irresistible passion in a reasonable person, and (4) between the provocation and offense, an insufficient amount of time passed for the voice of reason and humanity to be heard. *People v. Tardif*, 2017 COA 136, ¶ 22. We review de novo whether the instruction was warranted and consider the evidence in the light most favorable to the defendant. *Id.* at ¶¶ 16, 22.

### B. Additional Facts

¶ 10    At trial, Li's counsel requested a heat of passion instruction, arguing that it was supported by evidence of Francis's belligerent conduct, heated language, and level of intoxication, along with the presence of a semiautomatic rifle in the front seat visible to everyone and within Francis's reach. The trial court denied the

3

request, concluding that none of Francis's actions amounted to a highly provoking act that would excite an irresistible passion in a reasonable person.

## C.    Analysis

¶ 11    We conclude that the trial court correctly rejected the heat of passion instruction because there was no evidence at trial to support at least two of the four required factors.  More specifically, even if we were to assume that there was evidence that Li shot Francis in a sudden heat of passion, and that he did so before a sufficient amount of time had passed for the voice of reason and humanity to be heard, the instruction was still not warranted because the other two factors were not supported by any evidence.

¶ 12    First, there was no evidence at trial supporting a conclusion that Francis committed "a serious and highly provoking act."

4

¶ 13    Li maintains that the following evidence introduced at trial shows otherwise.[1]

- One witness testified that Francis was intoxicated and belligerent.

- One witness remembered telling a detective that Francis waved a gun around "like it was a toy," even though he later testified that Francis never had a gun.

- One witness testified that Francis was arguing with another person in the car, separate from his argument with Li.

- Multiple witnesses testified that Francis said, "Shut up, bitch" to Li.

- One witness testified that Li pistol-whipped Francis in response to Francis's comment.

---

[1] In his appellate briefing, Li also cites to statements that Timothy Martinez — who was in the driver's seat when the shooting occurred — made to Detective Andrews during the investigation. However, these statements were not admitted at trial. Even though Li contends that the court erred by excluding these statements (which we discuss below), for the purpose of evaluating whether the court erred by not instructing the jury on heat of passion, we consider only the evidence admitted at trial.

- One witness testified that Francis fought back after being struck with the pistol.

- One witness testified that Li shot Francis after Francis fought back.

¶ 14    At the outset, we note that Francis's belligerence and insults were insufficient to warrant a heat of passion instruction. *See Cassels v. People*, 92 P.3d 951, 960 (Colo. 2004) (Coats, J., dissenting) (collecting cases); *see also People v. Ramirez*, 56 P.3d 89, 94-95 (Colo. 2002) (refusal of marriage proposal and demand to leave one's home do not warrant heat of passion instruction); *United States v. Frady*, 456 U.S. 152, 174 (1982) ("Mere words, however, no matter how insulting, offensive or abusive, are not adequate to induce a homicide.") (citation modified).

¶ 15    Li argues that he was provoked not only by Francis's insults, but also by how Francis fought back after being pistol-whipped. He likens his case to *Cassels*, 92 P.3d at 957, where a heat of passion instruction was appropriate in part because the victim fought the defendant before the defendant shot him. But *Cassels* is factually distinguishable from Li's case in several key respects.

6

¶ 16    In *Cassels*, the victim followed the defendant around an apartment, pushing, insulting, and threatening to beat him. *Id.* The victim also positioned himself in front of the only exit and stood next to an iron bar that he had previously said would make a good weapon. *Id.* In contrast, there is no evidence that Francis ever prevented Li from getting out of the parked car or otherwise removing himself from the conflict. Additionally, in *Cassels*, the defendant was wearing only a towel and was "in a highly vulnerable position" when the victim provoked him. *Id.* Li, by comparison, had a loaded gun in his hand. Finally, the defendant in *Cassels* testified that he "freaked out" and "lost it," and he did not remember shooting the victim. *Id.* No such statement exists in Li's case. To the contrary, the evidence at trial indicated that Li and Francis simply got into in an argument that turned physical before the shooting.

¶ 17    Li also presented evidence that a witness recalled telling a detective that Francis waved a gun around, but Francis allegedly did so "like it was a toy," not in an aggressive or menacing manner. There is no evidence Francis pointed the gun at Li or threatened to use it. Additionally, the record is unclear about how much time

7

passed between this conduct and the shooting, casting doubt on whether an insufficient amount of time passed after Francis waved the gun for the voice of reason and humanity to be heard.

¶ 18 Further, the record is devoid of any evidence of any hidden subtext that would make Francis's conduct particularly threatening or highly provoking. *Cf. Tardif*, ¶ 24 (heat of passion instruction warranted where the victim — a rival gang member — wore a bandana over his face, and the defendant testified that "nine out of ten times when somebody has a bandana on their face they're gonna do dirt or they're gonna do something that they're not supposed to be doing and try not to get caught for it"). Rather, Li even concedes that "there was no evidence" that he and Francis "had problems or exchanged insults" before the shooting.

¶ 19 Second, given our conclusion that Francis did not commit a serious and highly provoking act, it follows that Francis's behavior would not excite irresistible passion in a reasonable person. Indeed, according to Li, Francis was insulting others in the car while everyone was trying to listen to music, yet only Li responded by pistol-whipping and shooting Francis. "[A]n objectively reasonable person" would not have "suffered an irresistible passion

8

to kill" from Francis's conduct. *People v. Dooley*, 944 P.2d 590, 594 (Colo. App. 1997).

¶ 20 Because no evidence supported a heat of passion instruction, we conclude that the court did not err by refusing to provide it to the jury.

### III. Self-Defense Jury Instruction

¶ 21 Li argues the trial court erred by failing to sua sponte instruct the jury on self-defense. We disagree.

#### A. Standard of Review and Applicable Law

¶ 22 Although trial courts have a duty to instruct the jury on all legal matters applicable to the case, a court "is not an advocate and need not serve as counsel for either party." *Hansen v. State Farm Mut. Auto. Ins. Co.*, 957 P.2d 1380, 1384 (Colo. 1998). "A court's general duty to instruct does not extend to crafting theory of the case instructions when defense counsel fails to do so." *People v. Wade*, 2024 COA 13, ¶ 11.

¶ 23 A defendant is entitled to a jury instruction on an affirmative defense if some credible evidence, viewed in the light most favorable to the defendant, supports the instruction. § 18-1-407(1), C.R.S. 2025; *People v. Newell*, 2017 COA 27, ¶ 19. We review de novo

whether sufficient evidence supports a self-defense jury instruction. *People v. Coahran*, 2019 COA 6, ¶ 15.

¶ 24    Here, there is no dispute that there was some evidence that could have supported a theory that Li acted in self-defense. However, Li did not request a self-defense instruction at trial or object to the instructions given.  Therefore, reversal would be warranted only if the trial court plainly erred by failing to give a self-defense instruction sua sponte.[2]  *Wade*, ¶ 12.  We reverse for plain error in the jury instructions "only when (1) an error occurred; (2) the error was obvious; and (3) the defendant demonstrates not only that the instructions affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to his conviction."  *Id.* (citation modified).

---

[2] The People argue that Li's defense counsel made a strategic decision after consultation with Li to adopt a theory of defense based on accidental shooting rather than self-defense.  Thus, they argue, counsel's failure to request a jury instruction on self-defense was not an "oversight," as Li contends, but instead a waiver.  *See People v. Rediger*, 2018 CO 32, ¶ 39 (defining waiver as "the intentional relinquishment of a known right or privilege") (emphasis omitted).  We do not need to reach this argument because we conclude that the court did not err at all.

## B.    Additional Facts

¶ 25    About a year-and-a-half before trial, Li filed a "notice of affirmative defense — self defense" indicating that he would argue self-defense at trial.  A month before the trial date, however, Li moved for a continuance.  One of the grounds for his request was that he had "expressed his intent to testify and advance a theory of defense other than that proposed by his counsel."  Then, at trial, Li requested jury instructions on reckless manslaughter and heat of passion.  Notably, defense counsel did not request a self-defense instruction.

¶ 26    At multiple points at trial, Li advanced the theory that the shooting was accidental.  For instance, defense counsel asked prospective jurors about their views regarding different kinds of accidents, including gun accidents.  In opening statement, counsel said, "in the process of pistol-whipping Mr. Francis, . . . the gun went off, and the tragedy occurred," and he emphasized that the jurors would not "hear testimony that [Li] intended to kill."  In closing argument, defense counsel urged the jury to "find [Li's] conduct to be reckless and that he's guilty of manslaughter."  He also described at length how the gun may have malfunctioned and

gone off by accident while Li was pistol-whipping Francis. Counsel never mentioned self-defense in either his opening statement or closing argument.

¶ 27 Our review of the record reveals only a few oblique references to self-defense.

- One witness testified that Li had told him to tell the detectives that Li shot Francis in self-defense or else Li "would find" him if he "snitched."

- One witness testified that Francis fought Li back after Li pistol-whipped him.

- Detective Andrews testified that "[o]ut of the over 100 jail calls [he] listened to, there was one time when [Li] used the word 'accident.' However, that was in the context of a self-defense scenario."

¶ 28 Then in closing argument, the prosecutor made several comments about self-defense. He noted that, "given the opportunity to tell Detective Andrews anything," Li did not claim self-defense. The prosecutor continued:

> [I]n the jail calls that [Li] has, we know that only time he ever talked about it being an

accident and that was in the concept of this being a self-defense [sic].

By the way, ladies and gentlemen, self-defense means I intend to kill somebody. I fear for my life so much that I'm going to make sure that they don't take my life and I kill them.

. . .

Francis's DNA is not on [the gun] anywhere or anybody indicated that he reached for it or did anything for it. So this isn't about self-defense. This is about a man who would not be disrespected and told to shut up.

Li did not object to the prosecutor's comments.

## C.  Analysis

¶ 29    Li contends that, although defense counsel did not tender a self-defense instruction, Li endorsed self-defense pretrial and some evidence supported the instruction; therefore, the court plainly erred by not instructing the jury on self-defense sua sponte. We disagree.

¶ 30    While our review of the record reveals that there was at least a scintilla of evidence that Li acted in self-defense, Li's theory of defense at trial was that the shooting was accidental. Li appears to have made a deliberate decision to pursue this theory, as evidenced by his pretrial request for a continuance, which expressed his

13

intent to "advance a theory of defense other than that proposed by his counsel" — who had previously given notice that he intended to pursue self-defense — and by the arguments advanced by defense counsel at trial. Given this approach, it appears that the decision not to submit a self-defense instruction was tactical. "When the defense makes a tactical decision not to submit an alternative defense instruction, a trial court's failure to sua sponte offer the instruction does not constitute error, much less plain error." *Wade*, ¶ 16.

## IV. Prosecutorial Misconduct

¶ 31     Li contends that the prosecutor committed reversible misconduct during closing argument by (1) commenting on Li's post-arrest silence and (2) misstating the law on self-defense.[3] We disagree and conclude that any error was not plain.

---

[3] Li also suggests that the cumulative impact of the prosecutor's alleged misconduct warrants reversal. Because he does not develop this argument in his opening brief, however, we do not consider it further. *See People v. Cuellar*, 2023 COA 20, ¶ 44 (declining to address the merits of an undeveloped argument).

## A. Standard of Review and Applicable Law

¶ 32    We review prosecutorial misconduct that violates a defendant's constitutional rights de novo. *People v. Castro*, 2022 COA 101, ¶ 21. When reviewing claims of prosecutorial misconduct, we consider whether the conduct was improper based on the totality of the circumstances and whether the misconduct warrants reversal. *People v. Van Meter*, 2018 COA 13, ¶ 23. When a defendant does not object to the alleged misconduct, as here, we review for plain error and only reverse if the error is obvious and substantial. *Hagos v. People*, 2012 CO 63, ¶ 14. To rise to the level of plain error, prosecutorial misconduct must be flagrant or glaringly improper and so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004).

¶ 33    A prosecutor has wide latitude in the language and style of closing argument. *People v. Rhea*, 2014 COA 60, ¶ 46. But this latitude is not without limits. *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005). As relevant here, a prosecutor generally may not comment on a defendant's invocation of the right to remain silent, *People v. Key*, 522 P.2d 719, 720 (Colo. 1974), nor may a

15

prosecutor misstate the law, *People v. McMinn*, 2013 COA 94, ¶ 62. However, "because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful." *People v. Samson*, 2012 COA 167, ¶ 30.

### B.    Commentary on Self-Defense

¶ 34    During closing argument, the prosecutor made the following statements about self-defense:

> So when we get up here and we argue that this is a reckless act, that you can find that this is a reckless act, there's absolutely no evidence that that's what the defendant was thinking. In fact, in the jail calls that [Li] has, we know that only time he ever talked about it being an accident and that was in the concept of this being a self-defense [sic].
>
> By the way, ladies and gentlemen, self-defense means I intend to kill somebody. I fear for my life so much that I'm going to make sure that they don't take my life and I kill them.

¶ 35    Defense counsel did not object to these statements, but on appeal, Li contends that the prosecutor misstated the law and in doing so, injected self-defense into the case. We need not consider the accuracy of counsel's assertion, however, because even if it was

16

improper, the error was neither obvious nor substantial and thus did not amount to plain error.

¶ 36     First, the alleged error was not obvious.  Before describing self-defense as requiring an "inten[t] to kill somebody," the prosecutor addressed Li's claim that he acted recklessly.  In this context, the prosecutor's statement — while perhaps inartful — would not necessarily have been understood as a definition of self-defense.  Instead, the prosecutor was pointing out inconsistencies in Li's story over time by contrasting Li's statement in a recorded jail call, in which he suggested he had acted in self-defense, with his claim at trial that he acted recklessly.  *See People v. Payne*, 2019 COA 167, ¶ 50 (prosecutor's alleged misstatement of law did not constitute plain error in part because "the prosecutor had wide latitude to respond to [defense] counsel's arguments").

¶ 37     Second, the alleged error is not substantial.  As discussed above, Li's theory of defense at trial was that the shooting was

accidental, and the jury was not instructed on self-defense.[4]

Therefore, because the jury would have had no reason to consider the legal definition of self-defense, the prosecutor's statements likely did not impact the outcome of the trial. Nonetheless, if — as Li argues — the prosecutor's statement left the jury with the impression they were to consider self-defense, nothing in the record suggests that the prosecutor's comments confused jurors as to the applicable law. Thus, any error was not substantial.

¶ 38    Because the alleged error was neither obvious nor substantial, it does not warrant reversal under plain error review.

### C.    Commentary on Post-Arrest Silence

¶ 39    Li contends that the prosecution also committed misconduct by commenting on Li's post-arrest silence. Again, we reject this contention under plain error review.

---

[4] To the extent Li suggests that the court should have given a sua sponte curative instruction after the prosecutor's closing argument, we also reject this argument. *See People v. Mersman*, 148 P.3d 199, 203 (Colo. App. 2006) ("[T]o receive a curative instruction, a defendant must request it, and a trial court does not commit plain error if it does not give a curative instruction sua sponte."); *see also People v. Valencia-Alvarez*, 101 P.3d 1112, 1117 (Colo. App. 2004) (no error "in the trial court's failure sua sponte to instruct the jury to disregard the challenged remark").

## 1. Additional Facts

¶ 40 Two days after the shooting, Detective Andrews interviewed Li. Detective Andrews advised Li of his *Miranda* rights and Li answered a few questions. Li told Detective Andrews that he was upset because he had seen his girlfriend, who was five months pregnant, handcuffed "over situations that [his] friends had done," describing "the entire situation [as] just confusing." When Detective Andrews asked what Li did after leaving the party, Li said he did not "feel comfortable answering these questions" without an attorney present. At this point, the interrogation ended.

¶ 41 During the trial, the prosecutor — without objection — admitted into evidence a redacted video and transcript of the interrogation. Both exhibits, as edited, ended before Li invoked his right to remain silent. The prosecutor also elicited testimony from Detective Andrews regarding how he advised Li of his rights during the interrogation — again, without objection. Then, during cross-examination, defense counsel asked Detective Andrews about Li's invocation of his Fifth Amendment right to remain silent.

> Defense Counsel: [] And so when given a
> statement, the mere fact that [Li] doesn't say
> much in the statement isn't anything that you

19

should consider, correct, because the burden is on the government, correct?

. . .

Detective Andrews: Sir, I thought it was telling that he was willing to talk to me until I confronted him with specific facts known to this investigation. And it was at the point when I asked him if he was in a white Lexus SUV that we didn't have any more conversation. That was telling to me.

Defense Counsel: Right. Even though he has a right to remain silent?

Detective Andrews: Sure does.

Defense Counsel: And that's a constitutional right?

Detective Andrews: It is.

Defense Counsel: And the fact that he said I don't want to talk anymore[,] that, to you, was telling?

Detective Andrews: No. It was the point at when he said that that was telling. Because I told him that I knew exactly what was going on and that was as much information as he wanted to provide, in my opinion.

¶ 42 At the end of the trial, the prosecutor made the following statements in closing argument:

[G]iven the opportunity to tell Detective Andrews anything, anything. This was self-defense. This was an accident. I was poking

20

the gun and my finger slipped and I killed him. When given any opportunity to do that, what does the defendant talk about? He talks about how upset he is because his girlfriend got arrested for the actions of his friends. He didn't even say his own actions. His actions of his friends. He's already got it, . . . he's putting into motion that somebody else is going to take the fall for this. That's intentional. That's deliberate. That's deceptive. That's the defendant. That goes again to that mental state, what is he thinking.

Detective Andrews says, gives him a little fact and he said, You've talked to a lot of people. Detective Andrews said, Yeah, we talked to a lot of people. So you know some things? Like, Yeah. Hmm. Tell us about that white Lexus. Done. That's the defendant holding back what happened.

Defense counsel did not object to any of these statements.

## 2. Analysis

¶ 43     Li contends that the statements quoted above were an improper reference to his post-arrest silence. We need not decide whether the alleged error was obvious — or even whether it was an error — because even assuming that it was, we cannot say the challenged statements so undermined the fundamental fairness of Li's trial as to cast serious doubt on the reliability of his judgment of conviction. We reach this conclusion for two reasons.

21

¶ 44    First, the prosecutor's comment was brief.  *See McMinn*, ¶ 70 (finding no plain error where the prosecutor's comments "made up a small part of the prosecutor's closing argument" to convict the defendant).  The prosecutor's one line, "That's the defendant holding back what happened" — even if a comment on Li's silence — followed comments about what Li *did* say and thus highlighted how Li's story changed after realizing that Detective Andrews had information about his own involvement.  Thus, any misconduct in referencing how Li invoked his right to remain silent was fleeting and not a significant focus of the prosecutor's closing argument.

¶ 45    Second, the jury first learned that Li invoked his right to silence during defense counsel's cross examination of Detective Andrews, not through any statement by the prosecutor.  Therefore, the fact that Li invoked his right to remain silent was not new information.  *See People v. Snelling*, 2022 COA 116M, ¶ 36 (finding no plain error where the jurors first learned about the subject of alleged prosecutorial misconduct during defense counsel's cross-examination, not through any statement from the prosecutor).

¶ 46    As the alleged error was not substantial, it does not warrant reversal under plain error review.

### V.    Admissibility of Out-of-Court Statements

¶ 47    Li contends that the court erred by refusing to admit an unavailable witness's out-of-court statements because the prosecution opened the door and because the statements qualified as residual hearsay.  We disagree.

### A.    Standard of Review and Applicable Law

¶ 48    A defendant has the right to present a complete defense by introducing all relevant and admissible evidence.  *People v. Elmarr*, 2015 CO 53, ¶ 26.  We review a court's decision to admit evidence for an abuse of discretion.  *People v. Clark*, 2015 COA 44, ¶ 14.  Trial courts have considerable discretion in determining the admissibility of evidence.  *People v. Brown*, 2022 COA 19, ¶ 57.  A trial court abuses its discretion when its decision is "manifestly arbitrary, unreasonable, or unfair, or based on a misunderstanding or misapplication of the law."  *People v. Heredia-Cobos*, 2017 COA 130, ¶ 6.  Additionally, we can affirm on any grounds supported by the record, and we are not bound to the trial court's reasoning.  *People v. Glover*, 2015 COA 16, ¶ 22.

¶ 49    There were seven people in the car when Li shot Francis. Timothy Martinez was driving, one person sat in the front passenger seat, Li sat in the middle row directly behind Martinez, one person sat between Li and Francis, and two people sat in the back row.

¶ 50    Li sought to call Martinez as a witness at trial but was unable to serve him.  Accordingly, Li moved to admit the following statements that Martinez made to Detective Andrews under CRE 807:

> At first [Li's] demeanor when he shot, he
> seemed scared as shit.  Like, really scared.
> Like it was a misfire, like, shot, you know,
> even if he wouldn't have hit him, you know.
> And he just looked kind of scared.
>
> And then all of us just looked at him and
> just — like, Fuck, [Li], what the fuck?  And
> then it was, like, shit and just went stone cold
> and just turned to all of us and asked — and
> told us if we saw anything, he'll kill each of us,
> every one of us right there and then.

In his motion to admit the statements, Li argued that the evidence was material to whether the shooting was accidental or intentional and that Martinez could not be served at his last address of record.

On the first day of trial, Li asked the court to hold his motion in abeyance.

¶ 51    At trial, Detective Andrews testified about Martinez's interview:

> Prosecutor: And you talked about the sister of the victim providing a lead.  What was the lead she provided?
>
> Detective Andrews: She said that [Francis's] best friend's name was [Martinez].  She didn't know anything else about him except his phone number, and she suggested that he would be a good place to start.
>
> Prosecutor: Were you eventually able to contact [Martinez]?
>
> Detective Andrews: I was.
>
> Prosecutor: Were you able to speak with [Martinez]?
>
> Detective Andrews: I did.
>
> Prosecutor: And then using the information that [Martinez] provided, were you able to then track down the rest of the parties who were inside the vehicle when [Francis] was shot?
>
> Detective Andrews: Yes.
>
> Prosecutor: Over the course of the investigation, over the past nearly three years, has [Martinez] been cooperative with the investigation?
>
> Detective Andrews: No.

25

¶ 52 Following this testimony, Li asked the court to admit Martinez's statements, arguing that Detective Andrews had "opened the door." The court denied the request. Li then asked the court to reconsider his motion to admit the statements under CRE 807. The court concluded that while the statements were offered for proof of a material fact and would serve the interest of justice, there were not circumstantial guarantees of trustworthiness. Specifically, the court noted that, in addition to Li, Francis, and Martinez, there were four other people in the car, three of whom testified. So, the court continued, "it begs the question, is there a circumstantial guarantee of trustworthiness when someone in the front seat [i.e., Martinez] turns around and says the complete opposite" of what the other witnesses reported. The court thus refused to admit the statements.

## C. Analysis

¶ 53 Li contends that Martinez's out-of-court statements were admissible because the prosecution opened the door through Detective Andrew's testimony and because the statements qualified as residual hearsay. We disagree.

## 1. Opening the Door

¶ 54    The opening-the-door doctrine serves to "prevent one party in a criminal trial from gaining and maintaining an unfair advantage by the selective presentation of facts that, without being elaborated or placed in context, create an incorrect or misleading impression." *Golob v. People*, 180 P.3d 1006, 1012 (Colo. 2008).  However, it does not give "unbridled license to introduce otherwise inadmissible evidence."  *People v. Cohen*, 2019 COA 38, ¶ 23 (quoting *United States v. Martinez*, 988 F.2d 685, 702 (7th Cir. 1993)).

¶ 55    According to Li, even though Detective Andrews did not testify to Martinez's exact statements, his testimony still opened the door because it revealed that Martinez provided information that allowed Detective Andrews to "track down the rest of the parties who were inside the vehicle."  Li argues that this left the impression that Martinez had described to the police the nature of the incident and the individual responsible.

¶ 56    Detective Andrews's testimony, however, merely described his investigative process and made no comment about who was responsible for Francis's death.  True, Detective Andrews said that Martinez's statements allowed him to find the other people "inside

27

the vehicle," but he did not suggest that Martinez identified the "individual responsible" or anything to that effect. Thus, Detective Andrews's statement was unlikely to mislead the jury to believe that Martinez told Detective Andrews that Li was responsible. Therefore, it did not open the door to admit Martinez's out-of-court statements.

### 2. Residual Hearsay Exception

¶ 57 Hearsay is an out-of-court statement admitted for the truth of the matter asserted. *People v. Thompson*, 2017 COA 56, ¶ 101. Hearsay statements are generally inadmissible unless they fall within an exception. *Id.* The exception for residual hearsay allows a hearsay statement to be admitted if it has "circumstantial guarantees of trustworthiness" and satisfies CRE 807's three-part test: (1) the statement is offered as evidence of a material fact; (2) the statement is more probative on the point for which it is offered than any other available evidence; and (3) admission of the statement will serve the purpose of the rules and the interests of justice. CRE 807; *see Vasquez v. People*, 173 P.3d 1099, 1106 (Colo. 2007). In considering the trustworthiness of a statement, courts should examine the nature and character of the statement,

28

the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made. *People v. Jensen*, 55 P.3d 135, 139 (Colo. App. 2001).

¶ 58 We perceive no abuse of discretion in the trial court's determination that Martinez's statements lacked circumstantial guarantees of trustworthiness. First, because Martinez was sitting in the driver's seat in front of Li, the shooting was out of his direct line of vision. *See People v. Blackwell*, 251 P.3d 468, 477 (Colo. App. 2010) (no circumstantial guarantees of trustworthiness where there was no indication the unnamed declarant observed conduct in question). Second, Martinez's interview took place after a shooting had occurred in his car, a situation that may have led him to make self-serving statements. *Cf. People v. Lujan*, 2018 COA 95, ¶ 27 (statements "motivated by a police investigation" are generally not trustworthy), *rev'd on other grounds*, 2020 CO 26.

¶ 59 We acknowledge that part of the court's determination that Martinez's statements lacked circumstantial guarantees of trustworthiness may have been premised on the court's apparent misunderstanding of Detective Andrews's testimony that Martinez

was Francis's best friend.[5]  However, the nature of the relationship between Martinez and Li has no bearing on the other factors that the court considered when deciding to exclude Martinez's statement.  Thus, even if the court misunderstood the nature of Li and Martinez's relationship, its decision to not admit the evidence was still grounded in reason and was not manifestly arbitrary or unfair.

## VI.    Disposition

¶ 60    We affirm the judgment of conviction.

JUDGE YUN and JUDGE SCHOCK concur.

---

[5] The court may have — as Li argues — incorrectly believed that Martinez's best friend was Li, not Francis, because, when denying Li's CRE 807 motion, the court stated that Martinez was "the only person who said a positive thing" and "a best friend would say that."