23CA1932 Peo v Montoya 05-28-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1932
Adams County District Court No. 21CR341
Honorable Patrick H. Pugh, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

James Paul Montoya,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE SULLIVAN
Pawar and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 28, 2026

Philip J. Weiser, Attorney General, Melissa D. Allen, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Mallika L. Magner, Alternate Defense Counsel, Crested Butte, Colorado, for Defendant-Appellant

¶ 1     Defendant, James Paul Montoya, appeals the judgment of conviction entered on a jury verdict finding him guilty of second degree kidnapping, first degree assault, three counts of second degree assault, two counts of first degree burglary, and two counts of stalking.  We affirm.

I.     Background

¶ 2     The following facts are supported by evidence introduced at trial.

¶ 3     Montoya and the victim were in a long-term relationship and lived together with their two daughters.  But in August 2020, a court issued a protection order that, among other things, required Montoya to vacate the victim's house and prohibited him from contacting the victim or visiting locations she frequented.  In response, Montoya moved in with his mother while the victim continued living at her house with their daughters.

¶ 4     The court later modified the protection order to allow Montoya to contact his daughters if authorized by the victim, but it still prohibited Montoya from visiting the locations the victim frequented.  Nonetheless, communication between Montoya and the victim became more frequent, and eventually the victim allowed

Montoya to visit the house. They spoke about reconciling and resumed a sexual relationship.

¶ 5     Montoya then started accusing the victim of cheating, and by January 2021 things became tense between the two. At that time, Montoya wasn't living with the victim but visited her at her house on weekends.

¶ 6     On February 4, 2021, the victim returned home after dropping her daughters off at school. Montoya approached her from around the side of the house. After going inside together, Montoya told the victim that he knew she was cheating. He started asking questions, became increasingly agitated, and eventually put the victim in a headlock. He slammed the victim's head into the tile floor and then cut her laptop's charging cord with a box cutter, using it to tie her wrists together. When the victim asked Montoya why he was doing this, he told her that she had taken his manhood away.

¶ 7     Montoya then took the victim to the basement and bound her legs, ankles, and wrists with rope. He put duct tape over her mouth and asked her questions, ripping the tape off to allow her to answer. This continued for about five hours.

¶ 8     During this time, Montoya also cut the victim's toes, pushed a box cutter into her leg, sliced off her clothing, burned her cheek with a lighter, and burned her feet by creating a blowtorch with a lighter and an aerosol can.  He threatened her with death and continued torture.  At one point, the victim admitted to having an affair.

¶ 9     Montoya eventually released the victim and fled the scene before police arrived.

¶ 10    After the February 4 incident, the victim and her daughters went into hiding.  The three started staying at a safe location while the victim's brother started staying at her house.  The victim and her brother eventually developed a routine in which the brother would pick the victim and her daughters up from the safe location and drop the girls off at school.  The two would then go to the victim's house to complete chores and spend time with her pets.

¶ 11    On February 26, 2021, consistent with their routine, the victim's brother picked up the victim and her daughters and dropped the girls off at school.  The pair then drove to the victim's house.  The brother let the victim into the home before returning to the car to grab some things.

¶ 12    Unbeknownst to the victim and her brother, Montoya had broken into the house and was waiting in the kitchen. He approached the victim and grabbed her, causing her to scream. The brother then ran into the house and pushed the victim outside, telling her to call 911.

¶ 13    Inside the house, Montoya stabbed the brother before fleeing. The brother exited the house and retrieved a gun from the trunk of his car. After grabbing the gun, the brother went back inside the house, realized Montoya was gone, and stepped outside to the porch. Police officers and an ambulance eventually arrived.

¶ 14    A jury found Montoya guilty of second degree kidnapping, first degree assault, three counts of second degree assault, two counts of first degree burglary, and two counts of stalking. It found him not guilty of attempted first degree murder.

## II.    Discussion

¶ 15    Montoya appeals. He contends that the trial court erred by denying his (1) challenge to the prosecution's use of a peremptory strike on a Black prospective juror; (2) mistrial requests; and (3) request that it instruct the jury on heat of passion. We address and reject each in turn.

## A.    *Batson* Challenge

¶ 16    Montoya contends that the trial court erred by denying his challenge to the prosecution's use of a peremptory strike on Juror B under *Batson v. Kentucky*, 476 U.S. 79 (1986).  Specifically, he argues that the court erred because it didn't (1) perform step three of the *Batson* analysis; (2) allow defense counsel to rebut the prosecution's argument at *Batson*'s second step; or (3) weigh all the pertinent circumstances.  He further contends that the court should have compared Juror B to other empaneled jurors.  We disagree.

### 1.    Applicable Law and Standard of Review

¶ 17    Colorado law permits a party to use a peremptory strike to excuse a potential juror "for almost any reason."  *People v. Johnson*, 2024 CO 35, ¶ 11.  But the Fourteenth Amendment's Equal Protection Clause prohibits excusing a juror based on the juror's race.  *Batson*, 476 U.S. at 86-87; *Johnson*, ¶ 13; *see also* Colo. Const. art. II, § 25.

¶ 18    When a party objects to their opponent's use of a peremptory strike as racially motivated, Colorado courts follow the three-step framework set forth in *Batson*.  *Johnson*, ¶ 17.

¶ 19     At *Batson*'s first step, the objecting party must make a prima facie showing that their opponent used a peremptory strike based on the juror's race. *Johnson*, ¶ 18. At step two, the burden shifts to the striking party to provide a race-neutral explanation for using the strike. *Id.* at ¶ 19. The objecting party may then rebut the striking party's stated reason. *Id.*

¶ 20     At step three, the court must consider all the circumstances related to purposeful discrimination, including the striking party's demeanor, the reasonableness of the striking party's race-neutral explanation, and whether that explanation is based in acceptable trial strategy. *Id.* at ¶ 20. While the court must consider all relevant evidence, it need not make express findings regarding how that evidence contributed to its ultimate conclusion. *People v. Beauvais*, 2017 CO 34, ¶ 32.

¶ 21     To prevail on a *Batson* challenge, the objecting party must prove purposeful discrimination by a preponderance of the evidence. *Johnson*, ¶ 21; *see also Beauvais*, ¶ 24 (a trial court should sustain a *Batson* challenge only if the non-discriminatory reasons are so incredible that a discriminatory hypothesis better fits the evidence). And "the ultimate burden of persuasion

regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Johnson*, ¶ 20 (quoting *People v. Wilson*, 2015 CO 54M, ¶ 14).

¶ 22     We review a trial court's conclusions at step one and step two de novo. *Id.* at ¶ 21. But we review a trial court's step-three conclusion for clear error. *Id.* We therefore defer to a trial court's ultimate *Batson* ruling if the record (1) demonstrates that the court considered all relevant circumstances and (2) supports the court's conclusion. *People v. Romero*, 2024 CO 62, ¶¶ 47, 66.

### 2. Additional Background

¶ 23     During voir dire, the prosecutor asked prospective jurors to raise their hands if they knew anyone who had been a victim of domestic violence. Many raised their hands, and the prosecutor questioned some of them individually. Juror B, who was Black, raised his hand but asked to discuss his experience in private.

¶ 24     Defense counsel then individually asked nineteen prospective jurors whether they thought someone could claim to be a victim of domestic violence but exaggerate what had happened. Each answered affirmatively. Defense counsel deferred asking Juror B the same question until their private discussion.

¶ 25    The parties and the court then questioned Juror B in private. Juror B stated that he had a deferred judgment in a domestic violence case from approximately ten years ago. While he felt he had been treated fairly by "the system," he said he thought the required classes were "a little overboard."

¶ 26    Juror B also agreed with defense counsel that domestic violence victims may exaggerate, noting that someone could hold a towel to a minor cut on their knee to make it look like they lost a significant amount of blood. He suggested that such a scenario had occurred in his case. But Juror B consistently stated that he wouldn't hold his experience against either party, their attorneys, or police officers. When asked by the court whether anything about his experience would render him unable to be fair and impartial to both sides, Juror B responded, "Not at all."

¶ 27    Later that day, the prosecution used a peremptory strike to dismiss Juror B. Defense counsel raised a *Batson* challenge.

¶ 28    Defense counsel argued that everyone agreed Juror B was fair, and that Juror B said he wouldn't hold his domestic violence case against anyone. Defense counsel therefore requested that the

prosecution provide a race-neutral reason for striking one of only two Black jurors on the panel.

¶ 29    In response, the prosecutor agreed that Juror B was reasonable.  But she argued that Juror B was biased against domestic violence victims, minimized his behavior in his own domestic violence case, and offered an example of a domestic violence victim allegedly exaggerating that was similar to an allegation in the instant case.

¶ 30    The trial court agreed that defense counsel had made a prima facie showing that the prosecution's peremptory strike was based on Juror B's race.  But it also found that the prosecutor provided a race-neutral explanation for the strike.  While the court acknowledged that Juror B stated he could be fair despite his prior domestic violence case, the court ultimately denied Montoya's *Batson* challenge.

### 3.    Analysis

¶ 31    We first reject Montoya's contentions that the trial court didn't perform step three of the *Batson* analysis or allow defense counsel to rebut the prosecutor's race-neutral explanation at the second step.  By denying the *Batson* challenge, the court implicitly

performed step three and credited the prosecution's race-neutral explanation. *See Romero*, ¶¶ 20, 62; *Beauvais*, ¶¶ 32-33. And while defense counsel never presented any argument after the prosecutor provided a race-neutral explanation, it was defense counsel's responsibility to challenge that explanation. *See Johnson*, ¶ 20; *People v. O'Shaughnessy*, 275 P.3d 687, 694 (Colo. App. 2010) (Because defendant bears the burden of proving discrimination, "the trial court properly could have considered defendant's failure to rebut as acquiescence in the prosecution's explanation."), *aff'd*, 2012 CO 9; *cf. People v. Hall*, 2021 CO 71M, ¶ 32 ("We do not believe that defense counsel was deprived of [the opportunity to present additional argument] merely because counsel declined the opportunity.").

¶ 32 As to Montoya's remaining contentions, we conclude that the trial court "considered all the relevant circumstances" and that the record supports its ruling that Montoya failed to prove purposeful discrimination by a preponderance of the evidence. *See Romero*, ¶¶ 47, 66.

¶ 33 The prosecutor's explanation — including Juror B's attitude toward domestic violence victims and the example of a victim's

exaggerated injury he provided from his own domestic violence case — is supported by the record. *See Beauvais*, ¶ 33. Moreover, the trial court didn't find the prosecutor's explanation pretextual, nor did it find that the prosecutor wasn't credible. *See id.*

¶ 34    The record also reflects that the trial court considered Juror B's statements that he could be fair despite his prior domestic violence case. *See id.* at ¶¶ 33-34. And while we agree that the court apparently didn't compare Juror B to other stricken jurors, defense counsel didn't ask the court to do so. *Cf. id.* at ¶ 50 ("At the very least, an objecting party's failure to raise an alleged similarity to the trial court suggests that it is not a useful comparison.").

¶ 35    Still, we may conduct our own comparative analysis if "the record facilitates a comparison of whether the jurors are similarly situated." *Id.* at ¶ 52. An empaneled juror is similarly situated to a stricken juror if they have "the same characteristics for which the striking party dismissed the [stricken] juror." *Id.* at ¶ 57.

¶ 36    Here, Montoya argues that, like Juror B, several empaneled jurors agreed that domestic violence victims may exaggerate their injuries. But none of those jurors identified themselves as a defendant in a prior domestic violence case. *Id.* at ¶¶ 57-61. Nor

11

did any empaneled juror offer a detailed example, like Juror B's, of a domestic violence victim exaggerating their injuries that resembled an allegation in this case. *Id.*

¶ 37 Accordingly, we conclude that the trial court didn't err by denying Montoya's *Batson* challenge.

### B. Mistrial

¶ 38 Montoya next contends that the trial court erred by denying his mistrial motions. In seeking a mistrial, Montoya asserted that the court improperly allowed the jury to hear testimony from (1) Montoya's son that he was cooperating with police because he didn't want his sisters going through "that"; and (2) the victim's neighbor about Montoya being an aggressive person. Montoya argues that this testimony was improper under CRE 404(b) and that no remedy could cure the prejudice. We perceive no error.

#### 1. Standard of Review and Applicable Law

¶ 39 A mistrial is a drastic remedy, and a trial court has broad discretion to grant or deny a mistrial motion. *People v. Owens*, 2024 CO 10, ¶ 125. We reverse only if we find a "gross abuse of discretion" that caused "prejudice to the defendant [that was] too substantial to be remedied by other means." *Id.*

12

¶ 40    In determining whether a mistrial is warranted, a court

considers "the nature of the inadmissible evidence, the weight of the

admissible evidence of the defendant's guilt, and the value of a

cautionary instruction." *People v. Van Meter*, 2018 COA 13, ¶ 11.

Fleeting or ambiguous references to a defendant's prior bad acts are

less prejudicial and typically don't warrant a mistrial. *People v.*

*Salas*, 2017 COA 63, ¶ 12.  And because we presume that a jury

understands and follows a trial court's curative instructions, a

mistrial is warranted when the court gives a curative instruction

only if "the evidence at issue 'is so highly prejudicial . . . it is

conceivable that but for its exposure, the jury may not have found

the defendant guilty.'" *Owens*, ¶ 128 (quoting *People v. Goldsberry*,

509 P.2d 801, 803 (Colo. 1973)).

## 2.    Additional Background

¶ 41    The following exchange occurred while Lazareth Dominguez,

Montoya's son, was testifying on redirect for the prosecution:

> [PROSECUTOR]: And is it fair to say, prior to
> February of 2021, you and your dad were
> working on repairing your relationship?
>
> [DOMINGUEZ]: Yes.

13

> [PROSECUTOR]: But despite this, you were cooperating with the police in your father's apprehension?
>
> [DOMINGUEZ]: Yes.
>
> [PROSECUTOR]: And why were you doing that?
>
> [DOMINGUEZ]: Because – I mean, my sisters didn't deserve any of that.

¶ 42 Defense counsel objected, but the trial court overruled the objection and allowed the prosecutor to repeat the question:

> [PROSECUTOR]: Why were you cooperating with the police?
>
> [DOMINGUEZ]: For my sisters' sake really. I grew up like that. And it was just something I didn't want them to keep going through either. So I thought enough was enough.

¶ 43 Defense counsel then requested a mistrial, arguing the prosecution had improperly introduced evidence prohibited by CRE 404(b). *See* CRE 404(b)(1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."). The trial court found that the prosecutor's question didn't elicit prohibited testimony, although the testimony implicated some "generic" prior behavior. The court

14

therefore instructed the jury to disregard the question and answer. The court concluded, however, that the testimony didn't prejudice Montoya enough to warrant granting a mistrial.

¶ 44 Later the same day, the following exchange occurred during the prosecution's direct examination of the victim's neighbor:

> [PROSECUTOR]: . . . I think [the last question] was describe your relationship with Mr. Montoya and [the victim].
>
> [NEIGHBOR]: Yeah. We pretty much know them from just -- from outside because we never actually have -- I think with Mr. Montoya it was just one time we have a conversation. And from the other neighbors, we kind of knew that he was kind of, like, an aggressive person.

¶ 45 Defense counsel objected, and the trial court sustained the objection and ordered the jury to disregard the testimony. Defense counsel then requested a mistrial, arguing the court had now allowed the jury to hear improper testimony from both the neighbor and Dominguez. Before ruling on that request, the court permitted the prosecution to attempt to rehabilitate the neighbor.

¶ 46 In denying Montoya's second mistrial motion, the court found that the prosecution didn't deliberately elicit Dominguez's or the neighbor's challenged testimony. It also noted that both statements

15

were fleeting and ambiguous and that "the evidence against [Montoya] does appear to be substantial."

¶ 47    Even so, the court wasn't convinced that the neighbor could be rehabilitated or refrain from making off-the-cuff remarks. It therefore struck his entire testimony and precluded him from testifying. It also allowed Montoya to submit a curative jury instruction and directed the jury to disregard the neighbor's testimony.

### 3.    Analysis

¶ 48    We will assume without deciding that the testimony above that Montoya challenges was inadmissible under CRE 404(b). *See People v. Vigil*, 718 P.2d 496, 505 (Colo. 1986) ("We assume for purposes of discussion that the reference to contraband qualifies as evidence of a crime other than the crimes for which the defendant was on trial."). But even making that assumption, we conclude the trial court didn't err by denying Montoya's requests for a mistrial. We reach this conclusion for five reasons.

¶ 49    First, we agree with the trial court that the prosecution didn't deliberately elicit improper testimony. *Salas*, ¶ 17; *People v. Scott*, 10 P.3d 686, 689 (Colo. App. 2000). Defense counsel asked

16

Dominguez questions on cross-examination regarding his relationship with his father, including that, "from about 12 to 18 years old, your dad wasn't really involved in your life at all, right?" Given this, we agree with the trial court that defense counsel's questions were meant "to show that there was some distance between Mr. Dominguez and Mr. Montoya," rendering it permissible for the prosecutor to ask Dominguez clarifying questions about their relationship on redirect, including why he was assisting the prosecution. *See Abeyta v. People*, 400 P.2d 431, 432 (Colo. 1965) (prosecutor has an "unqualified right" to rebut unfavorable inferences the jury may have drawn from the cross-examination of a witness); *People v. Nunez*, 684 P.2d 945, 947 (Colo. App. 1984) (defense counsel opened the door to prosecutor's question about what the witness had received in exchange for her testimony by repeatedly asking the witness if she had received a deal to testify).

¶ 50    As to the neighbor, the prosecutor asked only that he describe his relationship with the victim and Montoya; counsel didn't ask about the neighbor's opinion of Montoya or about Montoya's reputation.

¶ 51    Second, neither statement explicitly referred to Montoya's prior acts. *See Salas*, ¶ 15. Indeed, Dominguez's statements were ambiguous. Rather than referencing prior bad acts by Montoya, Dominguez merely mentioned growing up "like that," a generic statement that could refer to almost anything. *See Scott*, 10 P.3d at 689. The neighbor similarly didn't mention any specific prior bad act by Montoya but instead said that he was an "aggressive person."

¶ 52    Third, we agree with the trial court that the evidence of Montoya's guilt was substantial. *See Vigil*, 718 P.2d at 506. Specifically, the jury heard evidence that Montoya

- used a GPS tracker that he installed on the victim's car and a camera that he installed in her bedroom to keep tabs on her;

- followed the victim;

- sent the victim constant messages accusing her of cheating and asking her to confirm her location;

- bound the victim's arms and legs with a computer cord and tortured her for hours;

- broke into the victim's home, grabbed her, and stabbed her brother; and

- wrote letters to family members expressing remorse and disparaging the victim.

¶ 53   Fourth, Dominguez's statements were brief. *Van Meter*, ¶ 13. And the neighbor's statement was a "single, fleeting, nonresponsive comment." *Salas*, ¶ 15.

¶ 54   Finally, the court gave curative instructions and struck the challenged testimony. *See id.* at ¶ 17; *People v. Cousins*, 181 P.3d 365, 373 (Colo. App. 2007) ("We presume the jurors followed the court's curative instruction."). In addition, the court went further by prohibiting the neighbor from testifying. *Cf. Owens*, ¶ 130 (mistrial not warranted when court "employed several curative measures").[1]

¶ 55   Given all this, we conclude the trial court didn't abuse its discretion by denying Montoya's mistrial motions. *See Salas*, ¶¶ 15-18.

---

[1] To the extent Montoya argues that the court needed to confirm that the testimony complied with the requirements of *People v. Spoto*, 795 P.2d 1314 (Colo. 1990), before admitting it, we note that the trial court didn't admit the testimony; rather, the court struck the testimony and instructed the jury to disregard it.

## C. Heat of Passion Instruction

¶ 56 Montoya last contends that the trial court erred by denying his request to provide the jury with a heat of passion instruction.[2] He argues that the evidence supported the inference that, on February 26, the victim's brother "surprised [him] with [a] gun," an act that satisfied the low standard required to entitle him to a heat of passion instruction. We disagree.

### 1. Applicable Law and Standard of Review

¶ 57 Heat of passion is a mitigating circumstance that, if proved by the defense, reduces a second degree assault conviction from a class 4 felony to a class 6 felony. § 18-3-203(2)(a), (b), C.R.S. 2025; *People v. Howard*, 89 P.3d 441, 444 (Colo. App. 2003). Heat of passion requires the defense to prove that (1) the defendant acted "upon a sudden heat of passion"; (2) caused by the intended victim's "serious and highly provoking act"; (3) that was sufficient "to excite an irresistible passion in a reasonable person"; and (4) the interval between the provoking act and the injury was insufficient

---

[2] Colorado courts have used the terms "heat of passion" and "provocation" interchangeably in this context. *See Cassels v. People*, 92 P.3d 951, 955 n.5 (Colo. 2004). For consistency, we use heat of passion throughout this opinion.

for the defendant to hear "the voice of reason and humanity." § 18-3-203(2)(a); *see Howard*, 89 P.3d at 444.

¶ 58     The trial court must provide the jury with a heat of passion instruction if the defendant shows some supporting evidence on each element, regardless of how incredible, unreasonable, improbable, or slight it may be. *Cassels v. People*, 92 P.3d 951, 956 (Colo. 2004); *Howard*, 89 P.3d at 445. But the defendant is entitled to the instruction only if "the heat of passion is unexpected, unforeseen, and immediate." *People v. Valdez*, 183 P.3d 720, 723 (Colo. App. 2008). Thus, no instruction is necessary "when a person intentionally seeks out the highly provoking act in question." *Id.*

¶ 59     We review de novo whether sufficient evidence supported a requested heat of passion instruction. *See Castillo v. People*, 2018 CO 62, ¶ 32. In doing so, we consider the evidence in the light most favorable to the defendant. *Cassels*, 92 P.3d at 955.

## 2.     Additional Background

¶ 60     Montoya's contention relies primarily on the testimony of a bystander who was sitting in a car across the street from the victim's house on February 26. The bystander's testimony

suggested that Montoya didn't stab the victim's brother until after the brother returned to the house with a gun.

¶ 61 Defense counsel asked the trial court to provide a heat of passion interrogatory to the jury based on the bystander's testimony. The court denied the request, reasoning that it wasn't "unexpected or unforeseen that [the victim] or someone else would attempt to protect either the home or [the victim] from further incidents after an unlawful entry by [Montoya], particularly in consideration of the events of February 4."

### 3. Analysis

¶ 62 The undisputed evidence established that Montoya was already inside the victim's house on February 26 when the victim and her brother arrived. Because Montoya broke into the victim's house, in violation of a protection order, he intentionally put himself in the provoking situation and therefore wasn't entitled to a heat of passion instruction. *See Valdez*, 183 P.3d at 723 (defendant wasn't entitled to heat of passion instruction because he "intentionally put himself in the provoking situation by going to his estranged wife's house for the purpose of being there while she engaged in sexual relations with her boyfriend").

¶ 63    We aren't convinced otherwise by Montoya's argument that the victim frequently permitted Montoya to access the house despite the protection order. Montoya doesn't point to any evidence suggesting that the victim continued to allow him access to the house after the February 4 incident; to the contrary, the victim had moved out of the house and into a safe location to avoid encountering Montoya.

¶ 64    Nor are we convinced by Montoya's attempts to distinguish *Valdez.* Indeed, the two cases are similar. Like the defendant in *Valdez,* Montoya broke into his former partner's house, in violation of a protection order and with the knowledge that she was in a relationship with another person. *See id.* at 722-23. Under such circumstances, both defendants could have reasonably foreseen that breaking into their former partners' house might lead to a confrontation.

¶ 65    Accordingly, the trial court didn't err by denying Montoya's requested heat of passion instruction.

### III.   Disposition

¶ 66    We affirm the judgment.

JUDGE PAWAR and JUDGE MEIRINK concur.